**John DOE, Appellant,**

v.

**MEDLANTIC HEALTH CARE GROUP, INC., Appellee.**

**Nos. 00–CV–247, 00–CV–275.**

District of Columbia Court of Appeals.

Argued Oct. 3, 2001.

Decided Jan. 16, 2003.

Patricia A. Smith, with whom Dale Edwin Sanders, was on the brief, for appellant.

Leo A. Roth, Jr., with whom Albert D. Brault, Washington, DC, was on the brief, for appellee.

Before RUIZ and REID, Associate Judges, and BELSON, Senior Judge.

RUIZ, Associate Judge:

A jury awarded a verdict to John Doe against Medlantic Health Care Group, Inc ("Medlantic") in the amount of $250,000 for breach of confidential relationship.[1] The trial court subsequently granted Medlantic's motion for judgment notwithstanding the verdict on the grounds that Doe's action was filed outside the one-year statute of limitations. On appeal, Doe claims the trial court erred in granting judgment to Medlantic because it substituted its own view for that of the jury on the question of when the cause of action accrued, and erroneously applied a one-year statute of limitations to the tort of breach of confidential relationship, which he claims is governed by a three-year limitations period. Medlantic filed a cross-appeal, asserting that the trial court improperly admitted certain hearsay statements, and should have granted Medlantic's motion for judgment because Doe failed to prove a *prima facie* case of breach of confidentiality. In addition, Medlantic claims it was entitled to a new trial because the verdict was against the weight of the evidence and based on the misconduct of plaintiff's counsel. We conclude that the trial court erred in directing a verdict on the issue of accrual and find no merit to the cross-appeal. Thus, we reverse the entry of judgment for appellee and remand with instructions that the jury's verdict for appellant be reinstated and judgment entered for appellant.

## I.

## Facts

In the spring of 1996, Doe held two jobs: by day he worked for a federal agency and at night he worked as a janitor for a company that contracted to clean the Department of State. Although Doe had been diagnosed with HIV in August of 1985, he had not told anyone at his janitorial job that he was HIV positive. One of Doe's co-workers in the evenings at the State Department was Tijuana Goldring, who also held a day position at the Washington Hospital Center ("WHC")[2] as a temporary receptionist. On April 13, 1996, Doe went to WHC's emergency room suffering from severe headaches, nausea and high fever. He was discharged on April 16, 1996, but was unable to return to work for approximately two weeks because of these health problems.

On April 23, 1996, while still absent from work, Doe returned to WHC for a follow-up clinic visit after his discharge from the hospital. Knowing that Goldring worked at WHC, Doe stopped by the receptionist's desk to pay her a "courtesy call." After a brief conversation, Goldring asked him for the correct spelling of his uncommon last name because she wanted to send him a get well card. Doe testified that he did not think Goldring's request was odd and complied with the request as it was not unusual to get such a card from co-workers after having been out sick. Doe never received a card from Goldring, but did receive a card from fellow co-workers at the State Department with $50 enclosed.

Sometime in April of 1996, before Doe returned to work, Goldring told another co-worker at the State Department, Donnell Fuell, that John Doe "had that shit," meaning HIV or AIDS. When Fuell questioned her veracity, Goldring replied that it was "for real," and told Fuell she "got it from the hospital." Fuell knew that Goldring worked at WHC during the day.

---

1. Plaintiff was given leave of the court to litigate under a pseudonym because of the nature of the case.

2. Washington Hospital Center is owned by appellee, Medlantic.

Doe stipulated that within "a couple of days" of his conversation with Goldring at WHC on April 23, he learned that his co-workers at State knew of his AIDS diagnosis. On April 25, 1996, still before he returned to work, Doe went to the State Department to collect his paycheck, and he encountered co-workers Derek Nelson and Gordon Bannister outside the building. Both were laughing as Doe approached, and Nelson said to him, "Hey motherfucker, I hear you're dying of AIDS." Doe was "stunned" by this comment, but tried to cover his shock by laughing it off, saying, "Do I look like I'm dying?" before entering the building. Doe did not ask where Nelson had gotten this information, and Nelson did not tell him. As he left the building later that same day, Doe saw Fuell, who told him that Tijuana was "going around telling everybody you got AIDS." Fuell did not tell him how Goldring knew this information. Doe had never been teased by co-workers before that Friday about having AIDS, and that weekend he called Willie Jones, a co-worker and friend from the State Department, to ask if she had heard any rumors at work that he had AIDS. Jones stated she had. Doe did not ask Jones where she had heard the rumors or if Goldring was the source.

On Monday, April 29, 1999, when Doe returned to work at the State Department, he confronted Goldring "one on one" and asked her if she was responsible for spreading the rumors about him. When confronted with what Fuell had said, she didn't seem surprised, and told him "I wouldn't do you like that" in a serious manner. Doe testified at trial that he believed Goldring because he had a "good relationship" with her and considered her a friend. Later that same day, when Doe saw Fuell and Goldring together, he told Fuell that Goldring "said she didn't say that." Looking at Goldring, Fuell asked "What's he talking about?" Goldring responded "I don't know what he's talking about," and they "brushed it off" and went back to work. Because of Fuell's and Goldring's denials, Doe concluded it was "a Donnell Fuell joke," and "left it alone."

Edward Coles, a friend of Doe for twenty-five years, testified at trial that Doe called him about the incidents at work "right after he got out of the hospital" in April of 1996. The following exchange took place between Doe's counsel and Coles at trial:

Q: Did you learn about—did there come a time when you learned about [Doe's] problem with Tijuana Goldring and Washington Hospital Center?

A: He told me about the incident. When it first occurred, in the sense of after having come back to work from the illness and being approached by different innuendoes and people approaching him.

Q: You don't have to tell us sort of a blow-by-blow what he told you, but did he describe to you the problems he had with the Washington Hospital Center and Tijuana Goldring?

A: Yes, he did.

According to Coles, while Doe did not go into a lot of detail about his feelings about what was happening to him "he was angry about what happened."

Doe testified that his time at work after April 25, was "like a living hell," as he was teased, ridiculed, pitied and scorned. Co-workers who had previously eaten with him now shunned him, and he was the object of snide remarks, stares, and unwanted attention. This included crass comments such as, Doe has "that faggot thing," and "[don't] eat [Doe's] food."

On May 20, 1996, as Doe approached the time clock at the State Department where a number of co-workers, including Goldring, were waiting to process their time

cards before leaving, Fuell asked Doe about his health. Doe responded that he was fine, whereupon Fuell turned to Goldring and stated, "How do you like that T [Goldring's nickname]?" Goldring had an "intense look on her face, a look of 'I don't believe he said that' type of look." She did not respond, but motioned with her hands as though to tell Fuell to keep quiet. Doe testified that it was at this moment he realized that Goldring was the source of the rumors, and suspected that she may have seen his medical records at the hospital. On cross-examination at trial, he testified that:

> Prior to that point, for all I know, it could have been a Donnell Fuell joke. It could have been cause he's known to be a jokester. I confronted Tijuana. She said she didn't do that, and I left it alone. But the ongoing abuse and joking and general teasing of me, I was trying to get a handle on this thing, and it wasn't until the 20th [of May] that it was confirmed to me in my mind that this woman actually did this.

The following day, on May 21, 1996, Doe called WHC and spoke with the vice president of personnel and human resources to ask if the hospital had a policy on employees who disseminate confidential medical information. Doe explained what had happened and gave Goldring's name. The vice-president said she would talk to Goldring and told Doe that this type of dissemination was against hospital policy and the laws of the District of Columbia. She referred him to the hospital's "risk management" department.

Doe filed a complaint against Medlantic and Goldring on May 20, 1997, alleging tort claims of invasion of privacy based on Goldring's disclosure and breach of confidential relationship based on WHC's negli-

gence in permitting Goldring's access to confidential patient information. After Goldring was dismissed from the case, it proceeded to trial against Medlantic. The jury found Medlantic liable for breach of confidential relationship and awarded damages in the amount of $250,000. The jury found against Doe on the invasion of privacy claim because Goldring's disclosure was not within the scope of Goldring's employment with WHC. The jury was instructed on the statute of limitations and accrual of actions. The verdict form had a separate question on the statute of limitations,[3] and in answering this question, the jury explicitly found that the lawsuit was filed within the one-year limitations period.

Medlantic then filed a motion for judgment as a matter of law, alleging, among other assertions, that Doe's breach of confidentiality claim was time-barred by the applicable one-year statute of limitations. The trial court concluded that the statute of limitations expired for both claims before the suit was filed, even with application of the discovery rule, reasoning that the limitations period commenced on April 25, 1996, when Fuell first told Doe that Goldring started the rumors. According to the trial court, "[t]hat Fuell's credibility may have been suspect does not forestall inquiry; instead, it demanded inquiry because it was 'possible' that Fuell was correct." Moreover, the court noted that "plaintiff's own evidence unequivocally demonstrates that Fuell was convincingly corroborated at the very time he told plaintiff of Goldring on April 25," because only Goldring was connected to the hospital where Doe had been treated, Goldring had access "albeit unauthorized" to the general medical records, and Goldring's request for Doe's name was a "transparent

3. The verdict form asked, "Has the defendant proved by a preponderance of the evidence that plaintiff's privacy claims arose before May 20, 1996?" The jury answered "No."

ploy" to gain access to his records. The trial court particularly emphasized Coles' testimony that Doe was angry at WHC and Goldring in April 1996, as well as Doe's perceived failure to ask Jones whether Goldring was the source of the rumors. On the basis of this evidence, the court found that "it is clear that by the end of April there were more than ample circumstances to put a reasonable person in Doe's position" on notice that Goldring's guilt was substantial. The court observed that it did not matter "that a jury could reasonably conclude that the plaintiff acted with due diligence by contacting the hospital within 25 days of hearing of the first attribution of the rumor," because as a matter of law Doe's claims arose before May 20, 1996. Judgment was therefore entered in favor of Medlantic.

Doe filed a motion for reconsideration pursuant to Superior Court Civil Rule 59(e), seeking to alter and amend the judgment on the basis that the three-year statute of limitations applied. The court denied Doe's motion on the grounds that "it was accepted and understood by all [parties] that the applicable time limitation governing all claims was one year," and that under the discovery rule and based upon the record of this case, "the commencement of any claim against Goldring necessarily triggered a claim against the hospital, for the hospital's records were the only source to account for Goldring's knowledge of plaintiff's condition."

## II.

### Statute of Limitations

■ A claim usually accrues for statute of limitations purposes when injury occurs, but in cases where " 'the relationship between the fact of injury and the alleged tortious conduct [is] obscure,' this court determines when the claim accrues through application of the discovery rule,

i.e., the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing." *Mullin v. Washington Free Weekly, Inc.*, 785 A.2d 296, 298–99 (D.C.2001) (quoting *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472–73 (D.C.1994) (en banc)). When the discovery rule applies, a cause of action accrues when the claimant knows or by the exercise of reasonable diligence should know of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing. *See Bussineau v. President and Dirs. of Georgetown College*, 518 A.2d 423, 435 (D.C.1986). "The law of limitations requires only that the plaintiff have *inquiry notice* of the existence of a cause of action." *Hendel v. World Plan Executive Council*, 705 A.2d 656, 661 (D.C.1997). We have explained that a cause of action accrues for statute of limitations purposes when the plaintiff is deemed to be on inquiry notice, "because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such an investigation, if conducted, would have led to actual notice." *Diamond v. Davis*, 680 A.2d 364, 372 (D.C.1996) (per curiam). Thus, inquiry notice is "that notice which a plaintiff would have possessed *after* due investigation." *Id.* (emphasis added).

■ Although what constitutes the accrual of a cause of action is a question of law, when accrual actually occurred in a particular case is a question of fact for the fact finder. *See Cevenini v. Archbishop of Washington*, 707 A.2d 768, 770–71 (D.C. 1998). This is particularly so where the discovery rule applies because "[t]he critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Ray v. Queen*, 747 A.2d 1137, 1141–

42 (D.C.2000). As we have observed, "[i]n all cases to which the discovery rule applies the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances." *Diamond*, 680 A.2d at 372. "The relevant circumstances include, but are not limited to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Id.* Thus, although summary judgment on the issue of when accrual occurred may be granted in cases when there is no disputed issue of fact, *see, e.g., Hendel*, 705 A.2d at 661 (plaintiff placed on notice when defendant made representations which "any reasonable person would recognize as contrary to human experience and, indeed, to the laws of physics"); *Colbert*, 641 A.2d at 474 (plaintiff conceded knowing of injury and hospital's negligence and disputed only notice of extent of resulting injury), we have held that summary judgment is improper when there is a disputed question about plaintiff's diligence in investigating a possible cause of action, *see Ezra Co. v. Psychiatric Inst. of Washington, D.C.*, 687 A.2d 587, 593 (D.C.1996) (whether defendant's fraudulent concealment precluded plaintiff from further inquiry into a possible cause of action).

 Even where a plaintiff might know, or be deemed to know, of wrongdoing on the part of one defendant, accrual of his action against another, unknown defendant responsible for the same harm is not automatic, "unless the two defendants were closely connected, such as in a superior-subordinate relationship." *Diamond*, 680 A.2d at 380. Whether the relationship of the defendants is sufficiently close to cause accrual is also a question of fact, and notice may be imputed to the plaintiff by the same standard of reasonable diligence under the circumstances. *See id.* In

some circumstances, the relationship of the defendants along with other facts may establish as a matter of law that "a reasonable plaintiff with knowledge of misconduct of one would have conducted an investigation as to the other." *Id.*

Doe argues that the trial court erred in substituting its credibility determinations for those of the jury and refused to draw reasonable inferences favorable to him from the evidence. In particular, he contends that the trial court reached conclusions contrary to those of the jury in considering his testimony, as well as that of Coles and Fuell. Medlantic responds that the rumors at work of Doe's medical condition were enough to put Doe on inquiry notice; and, as such, the trial court was correct in ruling that there were ample circumstances to put a reasonable person on notice as to Goldring's and, therefore, WHC's, culpability before May 20, 1996.

 We begin our consideration by recognizing that we review the grant of directed verdict *de novo*, applying the same standards as the trial court. *See Breezevale Ltd. v. Dickinson*, 759 A.2d 627, 633 (D.C.2000), *op. adopted*, 783 A.2d 573 (D.C.2001) (en banc).

It is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment notwithstanding the verdict. Moreover, it is the responsibility of the jury (and not the judge) to weigh the evidence and to pass upon the credibility of witnesses. If impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury. *Id.* (quoting *Homan v. Goyal*, 711 A.2d 812, 817–18 (D.C.1998)). In considering a judgment for defendant notwithstanding a jury verdict for the plaintiff, the evidence must be viewed "in the light most favorable to the plaintiff, who is entitled to

every legitimate inference therefrom." *Etheredge v. District of Columbia*, 635 A.2d 908, 915 (D.C.1993).

■■■ Doe no doubt began to experience injury on April 25, when he returned to work and a co-worker harassed him about having AIDS, and thereafter, as he candidly testified, his time at work was "like a living hell." He must have known that in some way the privacy he had sought to maintain concerning his medical condition had been violated. That is not enough, however, to put him on inquiry notice. Whether Doe is deemed to be on inquiry notice depends on whether he met his duty to act reasonably under all the circumstances to investigate the source of the AIDS rumors. *See Diamond*, 680 A.2d at 372. Viewing the evidence in the light most favorable to the plaintiff, we think that a jury could conclude that Doe's actions show that he did so. Doe confronted Goldring on the first day of his return to work on April 29, only four days after Fuell had identified her as the source of rumors concerning Doe's medical condition. Goldring denied having spread these rumors, and the jury could credit that Doe believed her because they had a "good relationship" and he considered her a friend. Doe was not complacent, however, and later that same day, sought to confirm Goldring's denials by questioning Fuell in front of Goldring. Based on their responses, he was led to believe that the April 25 comments had been a "Donnell Fuell joke," given that Fuell was known to be a jokester. Moreover, in light of Goldring's denials, the jury could reasonably find that Doe acted with reasonable diligence under the circumstances and was not on notice until May 20, 1996, when he was again confronted by Fuell's comments and observed Goldring's attempts to silence Fuell. In context the jury could find that Doe reasonably concluded only then that Goldring was indeed the source of the

rumors and to further suspect she had gained access to his medical records at the hospital. *See Ezra Co.*, 687 A.2d at 593 (noting that whether defendant's fraudulent concealment precluded plaintiff from exercising due diligence in identifying possible causes of action is a factual question for the jury). As part of its consideration of Doe's circumstances, the jury could take into account evidence that a person in Doe's condition, facing serious health problems at the time, would not necessarily make an immediate connection between the disclosure of his condition and the hospital. If Doe reasonably believed that Goldring was not the source of the rumors until May 20, 1996, the jury could have found that he was not required to investigate the hospital's involvement before then. Because "impartial triers of fact could reasonably find the plaintiff's evidence sufficient, the case may not be taken from the jury." *Breezevale Ltd.*, 759 A.2d at 633.

In granting judgment, the trial court erred in several respects. First, the court's findings indicate that it found what it considered reasonable under the circumstances without deferring to the jury's reasonable conclusions on the issue of accrual. Further, in making its findings, the trial court mischaracterized or ignored the testimony of Fuell, Coles and Doe, and failed to draw reasonable inferences favorable to Doe. Nothing in the record before us indicates that, in addition to telling Doe on April 25, 1996, that Goldring was the source of the rumors, Fuell "had confided in [Doe] that her information came from the hospital" as the trial court recalled. In fact, Doe testified that Fuell did not tell him of the source of Goldring's information until the fall of 1996. The court also seems to have drawn its own inferences—contrary to those of the jury—in concluding that Coles testified that "[p]laintiff was

'angry' at [Goldring] and the hospital" when Doe called Coles shortly after his hospitalization in April. What the trial transcript reveals is that Doe's counsel incorporated mention of both Goldring and the hospital into his questions, while Coles himself did not testify directly that Doe was "angry" at WHC in April 1996. The jury could have credited Doe's testimony over that of Coles, or, even believing Coles, could have thought he incorrectly recalled details of the conversation, such as the date of the call. Even if Coles' testimony was as the trial court interpreted, it ignores that of Doe, who explicitly stated that he did not come to believe that Goldring and WHC were responsible until May 20, 1996. The trial court further found that Doe knew Goldring had access to the hospital's medical records of non-employees, despite the absence of any testimony to that effect, and characterized Goldring's request for Doe's last name as a "transparent ploy" when Doe in fact received a get well card at a later date from other co-workers at the State Department. It is the prerogative of the jury—not the judge—to weigh the evidence and pass on the credibility of witnesses. *See Breezevale Ltd.*, 759 A.2d at 633. In making its own findings different from those the evidence entitled the jury to find, and did find, the trial judge improperly appropriated the fact-finding role of the jury.

The trial court also erred in applying the discovery rule in this case. The court concluded that because Goldring worked at the hospital, that relationship was sufficiently close to establish as a matter of law that Doe should have known or investigated the hospital's wrongdoing once he became aware that Goldring was the source of the rumors. The trial court ruled that "even were we to concede plaintiff's justification in doubting Fuell, the limitations period would nevertheless commence on April 25, when Fuell told him it was Goldr-

ing who started the rumors." While it is true that accrual of the statute of limitations requires only inquiry notice, *see Hendel*, 705 A.2d at 661, the court disregarded Doe's efforts to investigate the source of the rumors and the effect of Goldring's subsequent denial of responsibility, contrary to our holding in *Diamond. See Ezra Co.*, 687 A.2d at 592. ("Given our ruling in *Diamond*, the question is whether Ezra filed its claim within three years of the time it knew, or through the exercise of reasonable diligence should have known, of its claim.") The reasonableness analysis considers the "confidential or fiducial relationship between the plaintiff and the defendant." *Diamond*, 680 A.2d at 376. Doe was entitled to presume that WHC would honor the confidential relationship between hospital and patient, before assuming that Goldring's actions were, beyond her own wrongdoing, evidence of the hospital's negligence. That Doe relied on such a presumption is evidenced by the fact that the day after he realized Goldring was the source of the rumors, he immediately called WHC to complain about her improper behavior. As the two claims in this case made clear to the jury, one theory of liability against the hospital, invasion of privacy, was solely dependent on Goldring's wrongdoing; if Goldring was liable, Medlantic would also be liable if she acted as its agent, *i.e.*, within the scope of her employment. The jury found for Medlantic on that claim, as it considered that Goldring had not acted as Medlantic's agent. The claim of breach of confidential relationship, on the other hand, was based on the hospital's own negligence in allowing Goldring to access Doe's medical records. Although inquiry notice is not dependent on knowledge of all aspects of a claim, the discovery rule requires knowledge of some wrongdoing. *See Bussineau*, 518 A.2d at 435. The jury reasonably

could find, as it did, that Doe acted reasonably in investigating the hospital's culpability.[4] We reverse the grant of judgment to appellee, and turn to appellee's cross-appeal.[5]

## III.

## Cross–Appeal

### A. Hearsay Statements

 Medlantic claims that the trial court erred in admitting Fuell's statement that when Goldring told him of Doe's medical condition, she also told him that she "got [the information] from the hospital." Medlantic argues that this testimony was inadmissible hearsay evidence which prejudiced appellee because it was allegedly the only evidence produced by Doe which linked Goldring's disclosure of Doe's medical condition to the hospital's medical records, and therefore, should have been excluded.[6]

The trial court noted that Medlantic's position on this issue "involves a basic inconsistency ... [w]hile it abjures these out-of-court statements on the issue of liability, it embraces them on the issue of statute of limitations." The trial judge first opined that the contested statement was "admissible to show plaintiff's knowl-edge, which was the operative issue on the defense of the statute of limitations." While the court admitted the testimony at trial under the exception to the hearsay rule for statements against interest, it recognized in its post-trial ruling that because Goldring appeared as a witness, such an exception was inapplicable. *See Laumer v. United States,* 409 A.2d 190, 199 (D.C. 1979) (requiring unavailability of declarant for hearsay exception for statements against interest). The court then asserted two alternative grounds under which the evidence was admissible: that the statement that "she got it from the hospital" was inextricably tied in a single conversation to the statement that Doe had AIDS, and was admissible as an integral part of the verbal act that Doe had AIDS, and that the out-of-court statement was admissible for the truth of the matter asserted because Goldring appeared as a witness, was observed by the jury and was subject to direct and cross-examination concerning her out-of-court statement.

Even if these grounds are doubtful, any error by the trial court in admitting Goldring's out-of-court statement was harmless. Other evidence properly admitted at trial made it obvious that Goldring had acquired the information about Doe's medical

4. Our dissenting colleague makes much of Doe's testimony that as soon as he concluded that Goldring was the source of the rumors at work, he also concluded that she got the information from the hospital. Believing that Goldring got the information from the hospital and believing that the hospital was at fault are not the same thing. In any event Doe acted to inquire of the hospital immediately upon concluding that Goldring was the source of the rumors.

5. Because we reverse on these grounds, we need not discuss Doe's additional arguments for reversal.

6. In its reply brief, Medlantic revives its hearsay objection to Fuell's testimony that Goldring informed him Doe had AIDS. This testimony, as the trial court observed, was admissible as a verbal act with regard to the invasion of privacy claim. *See, e.g., Puma v. Sullivan,* 746 A.2d 871, 876 (D.C.2000) (hearsay statement admissible as verbal act in contract case where used to prove words of offer spoken). Medlantic also raises new objections to alleged hearsay testimony of Doe and Margaret Palmer which we do not consider, as they are raised for the first time in its reply brief. *See Stockard v. Moss,* 706 A.2d 561, 566 (D.C.1997) ("It is the long-standing policy of this court not to consider arguments raised for the first time in a reply brief.")

condition from WHC, including facts which showed that she worked at the hospital and had asked Doe for the spelling of his last name, as well as testimony on the hospital's lax enforcement of protocols designed to protect the confidentiality of patients' medical records. Several witnesses, including Fuell, testified that Goldring had informed them that Doe had AIDS; these statements were clearly admissible as verbal acts relevant to the invasion of privacy claim. *See Puma v. Sullivan,* 746 A.2d 871, 875 (D.C.2000) (statement not offered to prove the truth of the matter asserted is not hearsay). On cross-examination after a question from defense counsel inquiring as to what proof existed to show that Goldring actually saw his medical records, Doe replied that "several of my co-employees told me that Tijuana told them that she got the information from the hospital, told them she has her sources at the hospital." On redirect, Doe identified those co-workers by name. Thus, the admission of Goldring's out-of-court statement through Fuell's testimony was cumulative of other evidence to the same effect, and, therefore, harmless. *See Harvey's, Inc. v. A.C. Electric Co.,* 207 A.2d 660, 661 (D.C.1965) (admission of hearsay harmless where there was sufficient uncontested proof on same issue to satisfy burden of proof).

### B. Motion for Judgment—Sufficiency of the Evidence

Medlantic asserts that Doe failed to prove a *prima facie* case of breach of confidentiality because there allegedly was no evidence that WHC disclosed confidential information. Specifically, Medlantic claims there was no direct proof of how Goldring was able to obtain the confidential information, no evidence of actual breaches by the hospital of its protocols concerning intra-department access to medical records, and that no evidence was presented as to the standard of care for similarly situated hospitals. With respect to this last point, Medlantic contends that Doe's failure to present expert testimony on a hospital's duty as a fiduciary with respect to record-keeping improperly led the jury to speculate that WHC "breached its own policies, or that such policies were, in and of themselves, deficient."

The trial court stated that Medlantic had failed to object on sufficiency grounds at trial and was, therefore, precluded from raising such a claim in its post-trial motion, but went on to discuss the issue under the assumption that timely objections were made.[7] It disagreed with Medlantic's position that expert testimony was required, and pointed to evidence introduced at trial through two witnesses—Larry Crockett and Betty Ward—which demonstrated that the hospital had established protocols for requesting medical records and that the "departure in practice from the system's safeguards was dramatic." Since there was "abundant evidence" of careless practices which would provide numerous ways for an insider at the hospital to get information, "[a]ll the jury had to believe is that the insider, Goldring, in fact [did] so," and the court concluded that the evidence was more than sufficient for a jury to believe that she did.

■■■ "The tort of breach of confidential relationship is generally described as consisting of the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 591 (D.C.1985) (internal quota-

---

7. We need not address whether Medlantic failed to preserve its sufficiency objection at trial because, like the trial court, we find no merit to the insufficiency claim even if it were properly raised.

tions and citations omitted). The tort arises from a duty that "attaches to non-personal relationships [such as hospital-patient] customarily understood to carry an obligation of confidence." *Id.* This duty imposes an obligation—stricter than the reasonable person test—to "scrupulously honor the trust and confidence reposed in them because of that special relationship...." *Id.* It is undisputed that the jury was properly instructed on the elements of this tort.[8]

We agree with the trial court that the evidence, viewed in the light most favorable to the plaintiff, sufficed to permit the jury to find that WHC breached its duty to "observe the utmost caution," see note 8 *supra*, in protecting the confidentiality of Doe's medical records. First, we reject the suggestion that expert testimony was necessary to establish the applicable standard of care in this case. In the negligence context, we have "refused to require expert testimony when the issue

8. The court instructed the jury as follows:

[t]o be entitled to your verdict on the claim of breach of confidential relationship, the Plaintiff must prove by a preponderance of the evidence the following four elements: One, that the Plaintiff's hospital records contained nonpublic information that the Plaintiff had AIDS; two, that Tijuana Goldring obtained unauthorized access to that information; three, that this disclosure amounted to a violation of the hospital's duty to protect the confidentiality of that relationship. I should say to protect the confidentiality of that information; that is, the information contained in the hospital record. And the fourth and final element is that this disclosure was without the Plaintiff's consent.

The court then went on to further explain the hospital's duty as a fiduciary to protect the medical records:

Since the hospital has custody of its patient's medical records as a fiduciary it owes a special duty to the patient to preserve the confidentiality of his or her records and to safeguard them against disclosure. The hospital's duty, therefore, is to conform to the standards of a reasonable fiduciary. That is the standard, a reasonable fiduciary.

Now, ladies and gentlemen, a reasonable fiduciary is required to observe the utmost caution characteristic of a careful, prudent person in protecting the confidentiality of the records the fiduciary holds in trust. The fiduciary is required to exercise the same caution, attention and skill that ... a reasonable fiduciary would use under similar circumstances. And we're talking about the period April, 1996.

However, ladies and gentlemen, the hospital is not a guarantor nor is it an insurer

if confidentiality. Its duty is to act as a reasonable fiduciary, not a guarantor, not an insurer. The mere fact that a third person has gained unauthorized access to hospital records does not by itself establish that the hospital was at fault or that it failed to exercise the utmost caution and prudence.

In determining whether the hospital has met this standard of due care you must consider all of the evidence bearing on this matter. Your evaluation of the evidence will shape what a reasonably careful and prudent fiduciary should do under the circumstances.

You may consider the system utilized by the Defendant hospital. You may consider the inspection and approval of that system by the joint hospital accreditation commission which is a national body that reviews all hospitals.

You may consider the extent to which ... the Defendant hospital system is or is not followed in practice. You may consider the extent to which the system was successful historically in preventing unauthorized disclosure. And you may consider all other circumstances that you determine to be relevant.

The burden of proof rests upon the Plaintiff to prove by a preponderance of the evidence that the Defendant breached its duty of confidentiality of its records. If the Plaintiff has failed to do so, your verdict should be for the Defendant on this claim.

On the other hand, if the Plaintiff has proved such a breach by a preponderance of the evidence and has also proved all of the other elements of this claim, your verdict should be for the Plaintiff on this claim.

before the jury did not involve either a subject too technical for lay jurors to understand or the exercise of sophisticated professional judgment." *National Railroad Passenger Corp. v. McDavitt,* 804 A.2d 275, 285 (D.C.2002) (quoting *District of Columbia v. Hampton,* 666 A.2d 30, 36 (D.C.1995)). The jury, as instructed, could consider the protocols that the hospital had established, which had been approved by a national hospital accreditation committee, as establishing the standard of care. The jury was specifically instructed that it could take into account whether the hospital's protocol "is or is not followed in practice" and "whether it was successful historically in preventing unauthorized disclosure." That instruction, which is not challenged by appellee, was proper here, where the evidence showed that Medlantic had failed to follow protocols it had established to safeguard its patients' medical records. *See WMATA v. Jeanty,* 718 A.2d 172, 178 (D.C.1998) (common carrier's departure from its own inspection schedule was "sufficiently extreme to support a prima facie showing that [it] had failed to exercise the 'highest degree of care'" without necessitating expert testimony on the subject); *Washington Hosp. Ctr. v. Martin,* 454 A.2d 306, 309 (D.C.1982) (no expert testimony required in medical malpractice case where the standard of care was "simply that which a reasonable and ordinary lay person would expect a hospital to provide to any patient under like circumstances"). *Cf. District of Columbia v. Freeman,* 477 A.2d 713, 719 (D.C.1984) (expert testimony required where matter to be determined involved technical determination of whether a painted cross walk was sufficient to render an intersection reasonably safe).

■ Substantial evidence was presented concerning the hospital's protocols and the routine failure of employees to comply with them. Crockett, a former medical records supervisor at WHC, and Ward, a worker for thirty-five years in the medical records department, testified as to the departures in practice from the established protocols. Crockett stated that while persons requesting medical records were supposed to give certain information, including their name, where they were calling from, and the purpose of the request for the record, in practice it did not always happen. The hospital's protocols were followed less often in the Employee Health department where Goldring worked as a receptionist. Ward similarly testified about lax enforcement of the protocols. As examples, she said that if a person called from the Employee Health department and merely gave his or her first name, that person's request for records would be processed without independent verification, and that individuals wearing a badge from a known department in the hospital could request medical records "stat" for emergencies—and be given the records without further inquiry if the need was considered urgent. Moreover, although Employee Health staff did not have authority to request charts of persons who were not hospital employees, if a person with a hospital department badge asked for a record, staff at the records control desk would accept what the person requesting the record said, without independently verifying if the record requested pertained to an employee.

Evidence was also presented showing that Goldring was a receptionist at the Employee Health department in April 1996 and that, of all Doe's co-workers, she alone could have had access to his medical records at WHC. She was identified by Fuell and others as the source of the rumors about Doe's condition, and it was she who asked for the spelling of Doe's last name, allegedly for the purpose of sending a card, which she never did. Finally, nei-

ther the log books which purportedly recorded all requests for medical records nor computer entries of such requests were produced by the hospital to show if anyone had accessed Doe's records at the relevant time. Although there was no direct evidence that the hospital's protocols were deficient or that they were breached to obtain Doe's medical records, evidence that there were significant lapses in the enforcement of the hospital's protocols to safeguard medical records, and that pointed to Goldring, a hospital employee, as the source of the unauthorized disclosure, sufficed to permit the jury to conclude that the hospital breached its duty as a fiduciary to maintain the confidentiality of Doe's medical records.

## C. Motion for New Trial—Misconduct of Plaintiff's Counsel [9]

■ Medlantic contends that Doe's counsel's conduct during trial was so improper as to require a new trial. This conduct included counsel offering his personal opinion during closing argument that Goldring lied and that WHC should have had a different computerized software system, deliberately ignoring the trial court's order prohibiting mention of part of a *Washington Post* article about unauthorized disclosure of other WHC medical records, continually voicing of asides to the jury, and suggesting that defense witnesses had destroyed evidence. Although the trial court described counsel's conduct as "reprehensible" and "deplorable to the extreme," it concluded that a new trial was not warranted in the case under the totality of circumstances involved.

■ "An attorney must not accuse a witness of lying on the witness stand." *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 628 (D.C.1986). The isolated suggestion that Goldring was lying, however, certainly was not likely to mislead, improperly influence, or prejudice the jury where proper instructions were given as to the jury's role as the sole arbiter of the facts. *See id.* Even in conjunction with the other examples of plaintiff's counsel's misconduct, counsel's actions do not compel us to require a new trial, particularly where Medlantic failed to object to such conduct or request a mistrial. *Cf. District of Columbia v. Bethel*, 567 A.2d 1331, 1337 (D.C.1990) (failure of party to object to trial court's curative instruction or demand a mistrial following opposing counsel's misstatements in closing argument precluded appellant from seeking a new trial on appeal). "[I]t is our function to review the record for legal error or abuse of discretion by the trial judge, not by counsel." *Id.* (quoting *Irick v. United States*, 565 A.2d 26, 33 (D.C.1989)). The trial court properly instructed the jury and admonished plaintiff's counsel for various improprieties. We find neither error nor abuse of discretion by the trial court here.

## IV.

For the foregoing reasons, the trial court's entry of judgment for appellee is reversed, and the case is remanded with instructions that the jury verdict be reinstated and judgment entered in favor of appellant.

*So ordered.*

---

9. Medlantic additionally claims that the jury verdict was against the weight of the evidence presented at trial, and required a new trial. To grant a new trial on this basis, the trial court must conclude, after considering all the evidence, that the verdict is "against the great—not merely the greater—weight of the

evidence." *Breezevale, Ltd.*, 759 A.2d at 638. We defer to the trial court's ruling, as it had the benefit of hearing the evidence first hand. *See id.* In this case, we are not persuaded that the trial court abused its discretion in light of the more than sufficient evidence of WHC's culpability described above.

BELSON, Senior Judge, dissenting.

Respectfully, I submit that the majority opinion plainly misapplies this jurisdiction's law on the issue of notice of a cause of action for purposes of commencement of the period of limitations. Judge Braman applied the law correctly. Before discussing the majority opinion, I will quote briefly from our controlling precedents and then set forth the most salient facts.

## I.

Recently, we summarized the relevant principles of law regarding limitations of actions in *Mullin v. Washington Free Weekly*, 785 A.2d 296, 298–99 (D.C.2001), as follows:

> As a general rule, "where the fact of an injury can be readily determined, a claim accrues for purposes of the statute of limitations at the time the injury actually occurs." *Colbert v. Georgetown University*, 641 A.2d 469, 472 (D.C.1994) (en banc). But when "the relationship between the fact of injury and the alleged tortious conduct [is] obscure," this court determines when the claim accrues through application of the discovery rule, i.e., the statute of limitations will not run until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing. *Id.* at 472–73. [Footnote omitted.]

We have made it clear that "for a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *East v. Graphic Arts Industry Joint Pension Trust*, 718 A.2d 153, 157 (D.C.1998) (quoting *Bussineau v. President & Dirs. of Georgetown College*, 518 A.2d 423, 435 (D.C.1986)).

In *Hendel v. World Plan Executive Council*, 705 A.2d 656, 661 (D.C.1997), we explained that the discovery rule does not allow the plaintiff to "defer legal action indefinitely if she knows or should know that she may have suffered injury and that the defendant may have caused her harm," stating:

> [A] right of action may accrue before the plaintiff becomes aware of all of the relevant facts. "It is not necessary that all or even the greater part of the damages ... occur before the [right] of action arises." *Knight v. Furlow*, 553 A.2d 1232, 1235 (D.C.1989) (citation omitted). Any "appreciable and actual harm flowing from the [defendant's] conduct" is sufficient. *Id.* "[T]he law of limitations requires only that [the plaintiff] have *inquiry notice* of the existence of a cause of action...." *Colbert, supra,* 641 A.2d at 473 (emphasis added) (quoting *Baker v. A.H. Robins Co.*, 613 F.Supp. 994, 996 (D.D.C.1985)).

*Hendel* held that, as a matter of law, the court had to ascertain whether "Ms. Hendel was placed on inquiry notice prior to September 1, 1986, of the *possibility* that she had suffered appreciable harm as a result of the wrongful conduct of the defendants." *Id.* (emphasis added). *Hendel* also pointed out that a plaintiff's actual or constructive knowledge of the relevant facts must be assessed under an objective "reasonable person" standard. *Id.*

## II.

Since the majority opinion sets forth the relevant facts and procedural history extensively, I will summarize only the facts that bear on the question whether appellee Medlantic Healthcare Group (the hospital) was entitled to judgment as a matter of law. The hospital established that Doe should have reasonably inferred on April 25, 1996, that he had suffered an injury

inflicted by Tijuana Goldring's dissemination of confidential information contained in and taken from Doe's hospital record and—even assuming *arguendo* that there was not such actual notice—that he had inquiry notice before the end of April 1996. Appellant filed this action on May 20, 1997. Thus, we examine what occurred on or before May 20, 1996.

- In April of 1996, appellant Doe and witness Tijuana Goldring were part-time evening employees of a company that provided cleaning services at the United States Department of State (State).

- Appellant, who had not disclosed to his coworkers at State that he was HIV positive, was hospitalized at the Washington Hospital Center (operated by Medlantic) on April 13–16, 1996, and returned there for an outpatient follow-up on April 23, 1996.

- While at the hospital on April 23, he paid a "courtesy call" on Tijuana Goldring, who was a part-time receptionist there during the day. During their conversation, Goldring asked Doe to spell his unusual last name, ostensibly so that she could send him a card. Doe never received such a card from Goldring.

- Doe received the customary card and cash gift given to all ill employees from his coworkers at State. Since he had informed a supervisor at State on April 13 that he was entering the hospital and would be on sick leave, his coworkers knew he was ill. He did not disclose the nature of his illness to his supervisor.

- On April 25, Doe returned to State while still on sick leave to pick up his paycheck. Before entering the building, he encountered two coworkers, Derek Nelson and Gordon Bannister, who were laughing. When Nelson "stunned" Doe by stating, "Hey motherfucker, I hear you're dying of AIDS," Bannister had a smile on his face.

- After Doe entered the building, he encountered coworker Donnell Fuell, who greeted him with "Hey, Tom, Tijuana [Goldring is] going around here telling everyone you got AIDS." Fuell did not tell Doe at that time that Goldring had also informed him that she obtained the information from the hospital. According to Doe, "When Donnell told me that Tijuana was spreading rumors, he wasn't joking with me, he was serious...."

- Over the ensuing weekend, Doe called a coworker and friend, Ms. Willie Jones, to inquire whether she had heard the rumor that Doe had AIDS. When Jones acknowledged that she had, Doe failed to ask her how she learned of the rumor and whether the source was Goldring, as Fuell had told him.

- On April 29, 1996, Doe's first day back at work, he approached Goldring "one on one and asked her if she was spreading the rumors ...." She denied it but, Doe acknowledged, did not appear surprised when he told her Fuell had informed him that she was spreading the rumors.

- Later that day, Doe approached Fuell and Goldring while they were together and told Fuell that "Tijuana said she did not say that." Notwithstanding his statement to Doe four days before, Fuell looked at Goldring and asked "What's he talking about?" She replied, despite having spoken about the matter earlier in the day with Doe, "I don't know what he talking about." Fuell and Goldring immediately left and went about their work.

- Doe testified that after April 25, 1996, his experience at his job was a "living hell" because he was teased, scorned, and made fun of in numerous ways. Some coworkers became nicer to him and treated him with pity, but he did not "want their pity."

- Between April 29 and May 20, 1996, Doe failed to ask Fuell to explain why on April 29 in front of Goldring he feigned ignorance as to what Doe was talking about, in light of what he had told Doe on April 25.

- Between April 29 and May 20, 1996, Doe also neglected to ask Goldring further about the matter, and also failed to ask Nelson, Bannister, or any of his other taunters the source of their information. Prior to May 20, Bannister had learned from Donnell that Goldring's source was the hospital. Finally, Doe also neglected to ask Ms. Willie Jones before May 20, 1996, whether she was aware of the source of the rumor.

- In April of 1996, Doe telephoned a friend, Edward Coles, who knew of his condition. When asked by Doe's counsel whether Doe had described the "problems he had with the Washington Hospital Center and Tijuana Goldring," Cole responded "[y]es, he did," and that Doe was "angry about what happened ... he told me he was angry about what happened ...."

- On May 20, Fuell questioned Doe about his health in the presence of a group of coworkers gathered at the time clock. Doe answered "I'm fine." Fuell asked Goldring "What's up with that, T (Goldring's nickname)"? Doe testified that Goldring's silence together with a hand motion she made "confirmed to [him] in [his] mind that [Goldring] actually [looked at his file and spread the rumor]."

- Doe testified that once he concluded that Goldring had spread the rumor, he inferred that she had obtained the information from the hospital records.

- The next day, May 21, Doe telephoned the hospital and spoke with a vice-president who informed him that the type of dissemination of information that Doe said had occurred was against hospital policy and the laws of the District of Columbia.

### III.

Following the jury's verdict, which included *inter alia* a finding against the hospital on the one-year statute of limitations issue that was framed in terms of the discovery rule, the hospital filed a post-trial motion for judgment as a matter of law and/or for a new trial. One of the hospital's bases for its motions was that the statute of limitations barred appellant's action as a matter of law. Several weeks later, the court issued a twenty-four page opinion, the first nine pages of which set forth the trial judge's reasons for granting judgment as a matter of law on the limitations issue.

In rejecting Judge Braman's reasoning and reversing, the majority states that "the trial court erred in several respects. First, the court's findings indicate that it found what it considered reasonable under the circumstances without deferring to the jury's reasonable conclusions on the issue of accrual." (Majority Opinion at 947).

To the contrary, I submit, the trial judge demonstrated that he was well aware of the respective roles of judge and jury, and correctly stated that it is true "that in most cases involving a discovery rule, the issue of when the statute begins to run is a jury question. But there are cases, like *Hendel, supra,* 705 A.2d 656, and *Colbert, supra,* 641 A.2d 469, where reasonable

minds cannot differ based on the evidence of record."[1] I agree with the trial judge that this is such a case.[2]

Further, with respect to the asserted trial court error, the majority states that in making his findings, Judge Braman "mischaracterized or ignored the testimony of Fuell, Coles and Doe, and failed to draw reasonable inferences favorable to Doe." (Majority Opinion at 947). This appraisal of the trial court's opinion is not warranted. The majority gives several reasons for this assessment, but only one of them has any substance, and that aspect did not compromise the trial court's analysis.

One criticism is that the trial judge "seems to have drawn his own inferences,—contrary to those of the jury—in

concluding that Coles testified" that in April of 1996 Doe told him he was angry with Goldring and the hospital. (Majority Opinion at 947). Attempting to explain how the trial judge somehow erred in accurately recounting Coles' testimony, the majority says that the transcript "reveals [ ] that Doe's counsel incorporated the mention of Goldring and the hospital into his questions, while Coles himself did not testify directly that Doe was 'angry' in April 1996." It is unsound, I suggest, to disconnect questions from answers to blunt the effect of Coles' response that in April of 1996 Doe said he was angry at Goldring and the hospital. The majority opinion speculates that perhaps the jury thought the witness incorrectly recalled details of the conversation, including its date. The testimony of Coles speaks for itself.[3]

1. The majority states, "Although what constitutes the accrual of a cause of action is a question of law, when accrual actually occurred in a particular case is a question of fact for the fact finder." (Majority Opinion at 945) ( citing *Cevenini v. Archbishop of Washington*, 707 A.2d 768, 770–71 (D.C.1998)). As *Hendel, supra*, and *Colbert, supra*, hold, however, there are cases where the controlling facts are uncontested and *when* accrual occurred becomes a matter of law.

2. In discussing Doe's argument that the trial judge erred in substituting his credibility determinations for those of the jury and failing to give Doe the benefit of reasonable inferences, the majority understates Medlantic's position as being "that the rumors at work of Doe's medical condition were enough to put Doe on inquiry notice..." (Majority Opinion at 946).

 Similarly, in beginning its discussion of the application of the discovery rule, the majority writes that "Doe no doubt began to experience injury on April 25 when he returned to work and a co-worker harassed him about having AIDS ...," (Majority Opinion at 947.) and goes on to recite Doe's testimony that his time at work then became "a living hell" to acknowledge that Doe must have become aware that in some way his medical privacy had been violated. (Id.) The majority concludes, "That is not enough, however, to put

him on inquiry notice." The glaring omission in both of the two majority formulations of the hospital's position is the majority's failure to acknowledge that on Doe's first return to his workplace on April 25, 1996, Fuell told him point blank that hospital employee Tijuana Goldring was telling everybody that he had AIDS. That salient fact, while noted in other parts of the majority opinion, deserves inclusion in any summary of appellee's position regarding inquiry notice.

3. The following is an excerpt from appellant's counsel's direct examination of witness Coles, who had been a social acquaintance of appellant for over twenty-five years:

 Q. Did you learn about—did there come a time when you learned about his problem with *Tijuana Goldring and Washington Hospital Center?*
 A. He told me about the incident. When it first occurred, in the sense of after having come back to work from the illness and being approached by different innuendoes and people approaching him.
 Q. You don't have to tell us sort of a blow-by-blow what he told you, but did he describe to you *the problems he had with the Washington Hospital Center and Tijuana Goldring?*
 A. Yes, he did.
 Q. And when he told you those problems, were you aware -

The majority opinion offers that even if Coles' testimony was as Judge Braman interpreted it, the judge ignored the testimony of Doe who stated that he did not come to believe that Goldring and Washington Hospital Center were responsible until May 20, 1996. (Majority Opinion at 948). But this criticism ignores the principle that the standards by which the discovery rule is applied are objective. Doe had the obligation under the discovery rule to interpret reasonably what was being said to him and done to him, and to inquire diligently into the matters involving the words and actions of his coworkers on and after April 25, 1996. *See Hendel, supra,* 705 A.2d at 661.

The majority also states that the trial judge "found that Doe knew Goldring had access to the hospital's medical records of non-employees" (Majority Opinion at 948) despite the absence of any testimony to that effect. This criticism, however, ignores Doe's own testimony that as soon as he concluded that Goldring was the wrongdoer, he inferred that she obtained the information from the hospital and that, indeed, is what the trial court indicated when it quoted plaintiff's testimony.[4] Within one day, Doe contacted the hospital and learned enough to conclude that it was quite likely that the hospital had not adequately safeguarded the confidentiality of its medical records.

The majority also faults the trial court for characterizing Goldring's request for Doe's last name as a "transparent ploy" (Majority Opinion at 948) when Doe in fact received a get well card at a later date from other coworkers at the State Department. But Goldring did not in fact send Doe a card, and was not one of the employees who took part in organizing the sending of such cards. Doe's hospitalization and absence on sick leave were known among his co-employees, who sent him the customary card on the week he returned to work. Once Doe became aware through the direct statement of Fuell on April 25 that Goldring was spreading the rumor that he had AIDS, he like anybody else could reasonably have viewed Goldring's request for the spelling of his unusual name as a transparent ploy.

The only factual reference by the trial judge cited by the majority that is not fully consistent with the transcript was to the effect that on April 25, Fuell not only told Doe of the rumor that Goldring was spreading, but also stated the hospital was the source of her information. Significantly, however, the trial judge did not repeat that misstatement in the two subsequent passages of his opinion in which he stated his reasons for concluding that Doe had ample notice on April 25 to trigger the statute and that Doe did not diligently pursue inquiry notice. In the first such subsequent passage, the trial judge referred only to Goldring's being the one who started the rumor (not to where Fuell said she got the information); in the second, the trial judge correctly noted that Doe based his lack of knowledge argument

THE COURT: When did he do that, sir?
THE WITNESS: When did he? The exact date, I'm thinking, is right after he got out the hospital.
So I think it was in '96 sometime.
THE COURT: Pardon me.
THE WITNESS: In April of '96, I believe.
. . . .
Q. So it's your testimony he did not convey his feelings to you?

A. Well, his feelings—He was angry about what happened. I could detect that and, you know, he told me he was angry about what happened, but that's basically—
(Emphasis added).

4. The trial court did not find that Doe knew that Goldring "had access" to such records, which has a different connotation.

in part on Fuell's not telling him until after May 20 that Goldring obtained the information from the hospital records. Thus, the trial court's initial misstatement, later restated correctly, does not undercut the trial court's result. Of greater importance, even without any statement to Doe on April 25 that Goldring said she obtained the information from the hospital, the proposition that the statute began to run before May 20, 1996, is correct as a matter of law.

The majority's essential conclusion is that Doe exercised reasonable diligence by engaging in the two conversations with Goldring and Fuell on April 29, and then being satisfied by them that Fuell was just joking on April 25 and that Goldring's denials could reasonably be accepted. Due diligence, the majority concludes, required no more, and was satisfied despite Doe's remaining passive until the fortuitous events of May 20.

To the contrary, I submit, Doe could not reasonably have been satisfied with Fuell's response on April 29 when in Goldring's presence Doe told Fuell of Goldring's denial, i.e., his saying, "What's he talking about" to Goldring and then returning to his duties with no further explanation. Clearly, due diligence required that Doe ask Fuell further about the matter outside the presence of Goldring as soon as his daily work at State permitted, and that he ask Fuell about the inconsistency between Fuell's April 25 statement and his evasive answer of April 29. A reasonable inquiry of Fuell could have been expected to bring out the fact that Goldring had already informed Fuell that she obtained the information from the hospital.

Likewise, Goldring's answer that she didn't know what Doe was talking about could not have been reasonably satisfactory to Doe, not only because Goldring clearly knew what he was talking about, but also because Doe had had his conversation with Goldring at the hospital just before the damaging leak of medical information was spread among his coworkers. Doe also failed to inquire further of his friend Ms. Willie Jones, to ask her what she could tell him about the source of the rumors once life became a "living hell" for him at his job. Likewise, he could have inquired of other coworkers—Bannister, for example, who testified that he knew before May 20 that Goldring was the source of the rumor and that she had told Fuell that she obtained the information from the hospital.

A reading of Judge Braman's opinion also refutes the majority's statement that he "disregarded Doe's efforts to investigate the source of the rumors and the effect of Goldring's subsequent denial of responsibility, contrary to our holding in *Diamond*" (citation omitted) (Majority Opinion at 948). As just explained, Doe's efforts to investigate those matters were feeble and short-lived and, despite the harsh atmosphere created by his coworkers, the unfortunate Doe took no further steps to pursue the matter until the fortuitous occurrence of May 20.

The majority's statement that "summary judgment is improper where there is a disputed question about plaintiff's diligence in investigating a possible cause of action" (Majority Opinion at 945–46) is far too sweeping. The mere fact that the parties dispute whether a plaintiff acted with reasonable diligence does not preclude the granting of summary judgment (or of a post-trial motion for judgment as a matter of law) in circumstances in which, as in this case, on the undisputed facts, the plaintiff did not act with reasonable diligence. The majority's reliance on *Ezra Company v. Psychiatric Institute of Washington, DC*, 687 A.2d 587, 593 (D.C. 1996), is misplaced. *Ezra* held that a plaintiff, who argued fraudulent conceal-

ment, could not be held as a matter of law to have acted with less than reasonable diligence when he accepted the assurances of two principles of the corporate defendant that they and the corporation had not violated the corporation's agreement giving plaintiff exclusive rights to serve as its real estate broker.

The majority suggests that Doe was entitled to presume that the hospital would honor its confidential relationship with him before assuming that actions of Goldring were evidence of the hospital's negligence. (Majority Opinion at 948). Doe himself convincingly refuted that position by stating that as soon as he decided that Goldring was the wrongdoer, he inferred that she got the information from the hospital. A telephone call to the hospital was all that Doe needed to ascertain that the hospital had failed to enforce its policy (and, Doe was told by a hospital vice-president, the laws of the District of Columbia) forbidding this type of dissemination of confidential medical information.

The essential weakness in Doe's case is that under the undisputed facts, viewed in the light most favorable to him, he simply failed to pursue the matter with reasonable diligence after he was first informed that Goldring was indeed the culprit. The trial judge's ruling was correct and the judgment as a matter of law for the hospital should be affirmed.[5]

---

5. In light of my view of the merits of Doe's appeal, I would not reach the hospital's cross-appeal. I do not disagree with the majority's treatment of the cross-appeal.