**Manuel SANTOS, Appellant**

v.

**GEORGE WASHINGTON UNIVERSITY HOSPITAL, et al., Appellees.**

No. 07–CV–992.

District of Columbia Court of Appeals.

Argued Feb. 26, 2009.
Decided Sept. 3, 2009.

Sherman B. Robinson and Lorin H. Bleecker, Rockville, MD, filed a brief, for appellant.

Steven A. Hamilton, with whom Matthew D. Banks, Bethesda, MD, was on the brief, for appellees The George Washington University and Karen Johnson, M.D.

Danielle S. Dinsmore, with whom Thomas V. Monahan, Jr., Baltimore, MD, was on the brief, for appellee District Hospital Partners LP t/a The George Washington University Hospital.

Before FISHER, BLACKBURNE–RIGSBY and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Plaintiff/appellant Manuel Santos, personal representative of the estate of Manuel Mbozo (appellant's father), sued defendants/appellees District Hospital Partners t/a George Washington University Hospital ("the Hospital"), The George Washington University ("the University"), and Dr. Karen Johnson ("Dr. Johnson") for medical malpractice in connection with injuries that Mr. Mbozo sustained, and that apparently led to his death, while he was a patient in the Hospital. The Superior Court granted summary judgment to all three defendants on the ground that appel-

lant's claims were time-barred. We affirm the grant of summary judgment in favor of the University and Dr. Johnson, but reverse the judgment in favor of the Hospital, and remand for further proceedings consistent with this opinion.

## I.

On arrival at the Hospital's emergency room on June 17, 2002, Mr. Mbozo complained of stomach pain and heartburn. He was admitted to the Hospital, where appellant visited him on June 18, 19, and 20. When appellant next visited his father on June 22, he observed a change in his father's condition: Mr. Mbozo did not greet his son with his usual interest and happiness, he was "not able to communicate so effective as usual," and he was "not much responsive." Mr. Mbozo complained that his head was "aching strongly"[1] and told appellant that he had "had a fall trying to go to the bathroom" and had hit his head. When appellant informed the nursing staff what Mr. Mbozo had said and asked about medication for his father, they responded, "We are taking care of that. We know that."

The following day, June 23, Mr. Mbozo was "moaning and groaning" and did not converse, uttering only "um" or "uhn-uhn" to indicate "yes" or "no." Appellant alerted a nurse, who replied "he is having fever." On June 24, Mr. Mbozo was "moaning and groaning," was "physically incapacitated," would not eat, and would say only "headache." Appellant's last visit to his father began on the evening of June 25. Upon entering the hospital room, appellant discovered that his father was "99 percent dead"; Mr. Mbozo's eyes were "fixed open" and he was "breathing very deeply." Rushing to the nurses' station, Mr. Santos implored "my father he is dying," but the nurses assured him that Mr. Mbozo was just sleeping. After appellant insisted, the nurses summoned a doctor, who examined Mr. Mbozo and confirmed the gravity of his condition. Mr. Mbozo was moved to the intensive care unit but, hours later, appellant was informed that his father had massive intracranial bleeding and that nothing could be done for him. Mr. Mbozo died on June 26 after being removed from life support.

The Superior Court litigation proceeded as follows. On June 23, 2005, appellant filed his complaint against the Hospital and "Karin Johnson, M.D." There followed a succession of amended complaints in which appellant changed the designation of the Hospital from "George Washington University Hospital" to "George Washington University Medical Center" and added (and then subsequently dropped) as a defendant Pulmonary Critical Care Associates, P.C., the employer of "Karin Johnson, M.D." Not until January 31, 2006, did appellant file a complaint that named the University and Dr. Johnson ("Karen Johnson, M.D.") as defendants along with the Hospital. In substance, all versions of the complaint were virtually identical, alleging that defendants negligently caused injury to Mr. Mbozo, resulting in his death, by failing to employ fall restraints and to timely diagnose and treat Mr. Mbozo's subdural hematoma.

On June 26, 2007, the University and Dr. Johnson (who was a medical resident employed by the University when she saw Mr. Mbozo on June 22, 2002) moved for summary judgment on the ground that the suit against them was time-barred. The Hospital likewise moved for summary judgment on the ground that the complaint was barred by the statute of limitations, adopting, as its memorandum in support of the motion, applicable portions of the Uni-

---

1. Mr. Mbozo, a recent immigrant from Angola, did not speak English. The quoted language reflects appellant's translation of statements that Mr. Mbozo made in Portuguese.

versity's and Dr. Johnson's memorandum in support of their own motion for summary judgment. Appellant filed an opposition to the motion of the University and Dr. Johnson, and he served copies of the opposition on counsel for the Hospital as well as counsel for the University and Dr. Johnson, but he did not file a separate opposition to the Hospital's motion.[2] Finding that appellant's claims against all three defendants were time-barred, the trial court granted summary judgment to the University and Dr. Johnson on August 1, 2007, and to the Hospital on August 13, 2007. This appeal followed.

## II.

When reviewing a trial court's grant of a motion for summary judgment, we conduct an independent review of the record and apply the same standard the trial court was required to apply. *See Scales v. District of Columbia,* 973 A.2d 722 (D.C.2009). Thus, even if a summary judgment motion has been unopposed, we, like the trial court, must "review the pleadings and other papers to determine whether the moving party is entitled to judgment." *Milton Props., Inc. v. Newby,* 456 A.2d 349, 353 (D.C.1983). We view the evidence in the light most favorable to the non-moving party, and will affirm the trial court's decision only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(c); *see also Clawson*

*v. St. Louis Post–Dispatch, LLC,* 906 A.2d 308, 312 (D.C.2006).

## III.

The parties agree that appellant's lawsuit is a survival action, pursuant to D.C.Code § 12–101 (2001),[3] which has a limitations period of three years from the date when the cause of action accrued. *See Strother v. District of Columbia,* 372 A.2d 1291, 1296 n. 8 (D.C.1977), *superseded by statute on other grounds as stated in Dickens v. District of Columbia,* 502 F.Supp.2d 90, 93 (D.D.C.2007). Appellees—the Hospital, the University and Dr. Johnson—contend that Mr. Mbozo's cause of action, and hence appellant's survival cause of action, accrued at the latest on June 22, 2002 (when Mr. Mbozo fell and appellant learned of his father's fall and injury), and that the three-year limitations period therefore expired on June 22, 2005. *See Arrington v. District of Columbia,* 673 A.2d 674, 677–78 (D.C.1996) ("Because the [Survival] Act ... concerns itself with a right of action which accrued prior to the decedent's death, it does not create a new one. Accordingly, the applicable period of limitations is the period that governs the underlying claim ... [and thus] a survival action generally accrues on the date of the decedent's injury, and not on the date of the decedent's death"). All three appellees thus argue that because appellant did not file his original complaint until June 23, 2005, the action against them is time-

---

2. Appellant asserts in his reply brief to this court that "[n]otice sent to [appellant's counsel's] e-mail address (presumably from E-file Express) that [the Hospital] had adopted the University's summary judgment motion ... was not received and therefore not reviewed, nor responded to." There follows an acknowledgment by appellant's counsel of his "need for additional training in the e-filing system during the time-frame surrounding the subject motions," training that he represents he has "since received."

3. Describing a survival action, section 12–101 provides that "[o]n the death of a person in whose favor or against whom a right of action has accrued for any cause prior to his death, the right of action, for all such cases, survives in favor of or against the legal representative of the deceased." A survival action is distinct from a wrongful death action, *see* D.C.Code § 16–2701 (2001), for which the limitations period is one year after death. *See* D.C.Code § 16–2702 (2001).

barred. In addition, the University and Dr. Johnson argue that, because they were not sued until January 31, 2006, even if arguably the cause of action accrued somewhat after June 22, 2002, the suit is clearly time-barred as to them.

■ In general, a "claim ... accrues for statute of limitations purposes when injury occurs." *Doe v. Medlantic Health Care Group, Inc.,* 814 A.2d 939, 945 (D.C. 2003).[4] However, when "the relationship between the fact of injury and the alleged tortious conduct is obscure," the so-called "discovery rule" applies, such that the claim does not accrue until "the claimant knows or by the exercise of reasonable diligence should know of (1) the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Id.* (citing *Bussineau v. President & Dirs. of Georgetown Coll.,* 518 A.2d 423, 435 (D.C.1986)). "[T]he quantum of knowledge sufficient to put one on notice of [his] claims against another" will vary depending on the facts of a case, *Brin v. S.E.W. Investors,* 902 A.2d 784, 793 (D.C.2006), including, for example, "the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations," *Diamond v. Davis,* 680 A.2d 364, 379 (D.C.1996). However, while the running of the limitations period is tolled until the claimant has notice of "some evidence of wrongdoing," the tolling does not continue simply because the claimant does not know (or cannot be charged with knowledge of) the full "breadth or nature of the [defendant's] tortious action." *Brin, supra,* 902 A.2d at 792; *see also Morton v. National Med. Enters., Inc.,* 725 A.2d 462, 468 (D.C.1999) ("fact that appellants lacked full knowledge of the extent of appellees' alleged wrongdoing" did not preclude accrual of

claim). The issue is when did the claimant have "inquiry notice that she might have suffered an actionable injury." *Bussineau, supra,* 518 A.2d at 428 (D.C.1986) (citation omitted).

■ Appellees argue that here, Mr. Mbozo's cause of action accrued on June 22, 2002, because his injury, its cause, and evidence to support allegations of wrongdoing were sufficiently known on that date. Appellees emphasize that both appellant and Mr. Mbozo knew of the injury to Mr. Mbozo's head and the circumstances surrounding it on June 22.

In determining when the cause of action accrued, we are presented not only with the issue of when there was knowledge (actual or constructive) of injury, its cause, and evidence of wrongdoing sufficient to trigger the running of the limitations period, but also with an additional issue: whose knowledge is relevant—appellant's or Mr. Mbozo's? Appellees assume that it is appellant's knowledge, not Mr. Mbozo's that matters. But appellees' position is difficult to reconcile with our reasoning in *Arrington, supra,* 673 A.2d 674.

*Arrington* was a survival action brought on January 22, 1991, by the daughter of a woman who had developed a decubitis ulcer during a hospitalization that ended on November 10, 1987, and who subsequently died of septicemia on January 23, 1988. *Id.* at 677. Defendant District of Columbia argued that the complaint was time-barred, as suit was not filed within three years of the date of the decedent's injury. *Id.* at 676, 677 n. 2. The daughter argued that the running of the limitations period was tolled by the decedent's mental condition, since there was "no evidence indicating that decedent herself [who had been admitted to the hospital with brain damage] was aware of the quality of care she

---

4. "Although what constitutes the accrual of a cause of action is a question of law, when accrual actually occurred in a particular case

is a question of fact for the fact finder." *Doe, supra,* 814 A.2d at 946.

was receiving." *Id.* at 678 (italics omitted). We observed that the trial court, in denying the District's motion for summary judgment, had "presumably held" that there was no showing that the decedent, "during the final months of her life, knew or should have known of the existence of all of the elements of an action for medical malpractice." *Id.* at 678. We then stated that "[t]his conclusion appears reasonable in light of the mother's condition and, for purposes of this appeal, we will assume (although, in light of our disposition, we need not formally hold) that the statute of limitations did not begin to run until the decedent's death on January 23, 1988." *Id.*

Thus, in *Arrington,* we assumed (although we did not formally hold) (1) that the decedent patient's knowledge was the critical factor, and (2) that the limitations period began to run not when the (mentally-impaired) patient was injured in the hospital, but on the date when she died. In making the first of these assumptions, we implicitly adopted an approach taken by many other courts, such as the U.S.

Court of Appeals for the Third Circuit in *Miller v. Philadelphia Geriatric Ctr.,* 463 F.3d 266, 276 (3d Cir.2006), that "the decedent's knowledge is relevant for the survival claim because it is his claim that survives his death brought by his personal representative due to his decease." [5] The second of the assumptions we made in *Arrington* resembles the approach taken by Maryland's highest court, which has established (in cases involving latent disease) that the limitations period begins to run for a survival action either "(1) when [the injured person] ascertains, or through the exercise of reasonable care and diligence should have ascertained, the [relevant facts] or (2) at death, whichever first occurs." *Trimper v. Porter–Hayden,* 305 Md. 31, 501 A.2d 446, 457 (1985) (superseded by statute on other grounds), *cited in Georgia–Pacific Corp. v. Benjamin,* 394 Md. 59, 904 A.2d 511, 533 (2006).[6]

■ We now explicitly adopt the rule that we implied in *Arrington, i.e.,* that the limitations period for a survival action begins to run (1) when the decedent (or his legal guardian, if there was one) [7] ascer-

---

5. *See also, e.g., McGraw v. United States,* 281 F.3d 997, 1003 (9th Cir.2002) ("with survival claims[,] the focus is on the decedent's knowledge"), *amended on different grounds,* 298 F.3d 754 (9th Cir.2002); *Meth v. A.H. Bull & Co.,* No. 99C–05–260 ASB, 2000 WL 1211149, *2 (Del.Super.Ct.2000) (limitations period began to run when decedent was "in possession of the pertinent facts of his injury"); *McDaniel v. Johns–Manville Sales Corp.,* 542 F.Supp. 716, 719 (N.D.Ill.1982) ("Where the now-deceased employee knew or should have known both that an injury has occurred and that it was wrongfully caused, the discovery clock began ticking") (internal quotation marks omitted). *But see White v. Johns–Manville Corp.,* 103 Wash.2d 344, 693 P.2d 687, 697 (1985) ("The statute of limitation pertinent to a survival action commences at the earliest time at which the decedent or his personal representative knew, or should have known" the cause of his injury).

6. *See also, e.g., Pastierik v. Duquesne Light Co.,* 514 Pa. 517, 526 A.2d 323, 326 (1987) ("the survival statute begins to run, at the latest, at death") (citation and internal quotation marks omitted).

7. Here, there is no evidence that appellant or anyone else was Mr. Mbozo's legal guardian, such that appellant's (or someone else's) knowledge is the relevant knowledge and must be imputed to Mr. Mbozo. *Cf. Miller, supra,* 463 F.3d at 273 (explaining that "although Miller closely monitored her brother's health and treatment, she was not his legal guardian," that therefore it was error for the district court to look to Miller to determine when any lawsuit should have been filed, and that "Miller would not have had the authority to file a suit on the decedent's behalf while he was alive unless she was appointed his guardian.... Hence, ... what Miller knew or what a reasonable person with Miller's knowledge should have known is irrelevant to

tained, or through the exercise of reasonable care and diligence should have ascertained, the nature and cause of his injury and some evidence of wrongdoing, or (2) at death, whichever occurs first. The record that was before the trial judge in this case indicates that Mr. Mbozo, who communicated that he had fallen and that his head ached "strongly," knew of his head injury and knew that it resulted from a fall in the hospital.[8] But, viewed in the light most favorable to appellant, the record presents a genuine issue of material fact regarding whether Mr. Mbozo actually had, or should have recognized, "some evidence of wrongdoing" on June 22, 2002 (or on any day prior to his death on June 26, 2002).[9] This is true for several reasons.

First, the summary judgment record is devoid of any indication that Mr. Mbozo believed that hospital personnel were responsible for his fall. There is no evidence, for example, that he repeatedly requested a bedpan, or requested that hospital staff come to his room to assist him in going to the bathroom, and tried to go to the bathroom on his own only after his calls went unanswered. *Cf. Keeton v. Maury County Hosp.*, 713 S.W.2d 314 (Tenn.Ct.App.1986) (hospital personnel had been advised that plaintiff patient "had a balance problem or vertigo and would need help when he got out of bed" and warned the patient not to get out of bed unassisted, but failed to "furnish[ ] [him] with a urinal ... after the removal of [a] catheter" and failed to respond to his repeated calls for assistance to get to the bathroom, with the result that the patient attempted to get up alone to go to the bathroom, fell, and injured himself; court held that expert testimony was not required to prove negligence). Similarly, there is no evidence regarding whether, on any of the days he spent in the hospital prior to his fall, Mr. Mbozo had been able to go to and from the bathroom on his own, without incident. There also is no evidence in the summary judgment record that Mr. Mbozo knew that his doctors had prescribed restraints to be

---

a determination of when the [Federal Tort Claims Act] statute of limitations ran").

8. Appellant disputes whether the mere fact of a "strong" headache alerted Mr. Mbozo to the existence of a possibly actionable injury—*i.e.,* whether the headache gave him reason to know that he had been "significantly injured." *Colbert v. Georgetown Univ.*, 641 A.2d 469, 473 (D.C.1994). However, according to the record evidence, the headache was accompanied by a decreased ability to communicate: on the day of the fall, Mr. Mbozo was "not able to communicate so effective as usual" and was "not much responsive." In his opposition to the motion for summary judgment, appellant himself makes the point that a "change in mental status" is symptomatic of a serious head injury.

9. Our case law makes "some evidence of wrongdoing" essential in establishing when a malpractice cause of action accrues. In *Bussineau, supra,* over a strong dissent, we explicitly rejected the so-called "knowledge of

cause in fact" accrual rule in favor of the "some evidence of wrongdoing" accrual rule. *Bussineau,* 518 A.2d at 435 ("We reject the "cause in fact" rule and adhere to the following rule: for a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing"). In doing so, we declined to follow the rule, applicable in Federal Tort Claims Act cases, established by the U.S. Supreme Court in *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (narrowly interpreting the discovery rule in FTCA cases to require only knowledge of injury and probable cause, in light of congressional intent to make only a limited waiver sovereign immunity). By making "precise and explicit" our adoption of the "some evidence of wrongdoing" rule, *Bussineau, supra,* 518 A.2d at 436, we joined "the company of every state which has considered the discovery rule as applied to facts such as those here or in *Kubrick.*" *Id.* at 428.

used during at least some portion of his hospital stay.[10]

Numerous courts have recognized that a fall by a hospital patient does not compel a finding that the hospital or its personnel were negligent.[11] Even the fact that a patient fell while going to the bathroom unassisted does not by itself "scream[ ] out"[12] hospital negligence.[13] Of course, the facts may show that Mr. Mbozo had reason to suspect wrongdoing even if the Hospital was not actually negligent. But, for example, if, prior to the day of his fall, Mr. Mbozo had successfully walked to the bathroom from his hospital bed, he may have had no reason to think that his fall was the result of Hospital negligence. This brings us to our second point, which is that we cannot say that, as a matter of law, the "mere fact" of his fall in a hospital put Mr. Mbozo on notice of possible wrongdoing.[14]

Third, the issue of when Mr. Mbozo had at least inquiry notice of "some evidence of wrongdoing" is complicated by the inconsistent record evidence about his mental state during his hospital stay. Appellant stated in his deposition that Mr. Mbozo was alert, talking and not "confused" at the time of his admission to the hospital. However, according to some documents in the record, Mr. Mbozo entered the Hospital with confusion, an inability to follow commands, an impaired ability to communicate and a "change in mental status."[15] The record does not suggest that Mr. Mbozo had the sort of profound mental impairment that has caused some courts, and this court in *obiter dictum*, to reason that an impaired decedent's cause of action

10. The record indicates that there was a June 20, 2002 physician's order for restraints for Mr. Mbozo. Appellant Santos relies on this order, and on the (alleged) absence of restraints on the day of Mr. Mbozo's fall, as a basis of his claim that the Hospital was negligent.

11. *See, e.g., Hilzendager v. Methodist Hosp.,* 596 S.W.2d 284, 287 (Tex.Civ.App.1980) ("It is not enough for the plaintiff to show that she was injured in the fall. In order to recover, she is, of course, required to show that her injury was caused by the hospital's negligence"); *Ephraim McDowell Hosp., Inc. v. Minks,* 529 S.W.2d 360, 361 (Ky.1975) ("hospitals are not required to maintain constant guard over sleeping patients").

12. *Bussineau, supra,* 518 A.2d at 426.

13. *Cf. Curtis v. Columbia Doctors' Hosp.,* 862 So.2d 1125, 1128 (La.Ct.App.2003) (holding that where, for six days prior to her fall, plaintiff had "been in the rehabilitative unit successfully voiding with the assistance of hospital personnel" and "had available to her a 'call button' to summon assistance, and her room was right across from the nurses' station wherein she could have actually called out for assistance," the "evidence preponderates toward plaintiff falling while improvi-

dently attempting to go to the bathroom without seeking assistance," not toward hospital negligence); *Potter v. Dr. W.H. Groves Latter-Day Saints Hosp.,* 99 Utah 71, 103 P.2d 280, 281 (1940) (holding that where patient "was consciously trying to leave her bed to go to the bathroom," the "conclusion seems inescapable that [patient's] fall and injury resulted from her own voluntary and conscious action, and not from any negligent act or omission to act by appellant" hospital) (internal quotation marks omitted).

14. *Washington Hosp. Ctr. v. Martin,* 454 A.2d 306, 309 (D.C.1982) (making this comment in the context in explaining that a patient will sometimes, though not always, need to present expert testimony to establish that a hospital fall resulted from negligence).

15. A Hospital discharge report describes Mr. Mbozo's condition upon admission as involving a "change in mental status," and an investigative report of the Office of the Chief Medical Examiner states that Mr. Mbozo presented "with the complaint of chest pains, confusion, non-verbal and not following commands." In addition, Dr. Johnson testified in her deposition that Mr. Mbozo was a "disoriented patient with neurological changes." [**App. 30, Supp.App. 117**]

did not accrue until death, since the decedent could not have been aware of the circumstances of her injury.[16] But, at the very least, Mr. Mbozo's mental state is relevant to whether an "objective, reasonable person"[17] would have had "inquiry notice" that Mr. Mbozo's falling while going to the bathroom evinced negligence. If Mr. Mbozo was in a confused mental state, the objective, reasonable observer might be more likely than not to suspect that the Hospital breached a duty to restrain him, or to have an attendant at his bedside, or to do more than merely instruct him not to get out of bed.[18] On the other hand, if Mr. Mbozo was lucid and mentally competent during the early days of his hospital stay, and perhaps had been able to go to the bathroom by himself during that time, the fact that he fell while attempting to do so on June 22, 2002, may not have caused an objective, reasonable observer to suspect Hospital negligence.[19]

**16.** *See, e.g., Arrington, supra,* 673 A.2d at 678 (regarding as "reasonable" "in light of the [decedent's impaired mental] condition" the trial court's finding that the cause of action accrued at death, much later than the date of injury, because there had been no showing that "during the final months of her life, [the decedent] ... should have known of the existence of all of the elements of an action for medical malpractice"); *Washington v. United States,* 769 F.2d 1436, 1439 (9th Cir.1985) (where plaintiff lapsed into a coma after receiving allegedly negligent treatment from Air Force hospital but did not die until fourteen years later, her cause of action did not accrue until her death because "[s]he was never aware of her injury or its cause"); *Miller, supra,* 463 F.3d at 273–74 (holding that malpractice claim of the plaintiff, who entered the hospital as a sixty-four year-old mentally retarded man with the mental age of a four-year-old child, did not accrue until his death, but distinguishing cases in which the plaintiff alleges that the injured patient was "rendered completely incompetent through the [defendant's] malfeasance," explaining that allowing mentally impaired persons "to file suit later than the objectively reasonable person would be tantamount to ruling that a plaintiff's mental infirmity can extend the statute of limitations") (internal quotation marks and citation omitted); *see also id.* at 276 (noting that under Pennsylvania jurisprudence, "while reasonable diligence is an objective test, it is sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question") (citation and brackets omitted).
*But see Smith v. United States,* 518 F.Supp.2d 139, 161, 157 (D.D.C.2007) (rejecting plaintiff's argument that the statute of limitations was tolled because of her mental state, observing that "the test for whether a plaintiff should have discovered necessary facts for purposes of the discovery rule 'is an objective one,'" and citing authority that "mental incompetency, standing alone, will not toll the running of the statute of limitations under the FTCA") (internal quotation marks and brackets omitted); *Hendel v. World Plan Executive Council,* 705 A.2d 656, 664 (D.C.1997) ("an objective, reasonable person test applies to discovery rule issues"); *Doe, supra,* 814 A.2d at 958 (Belson, J., dissenting) (criticizing the majority opinion for "ignor[ing] the principle that the standards by which the discovery rule is applied are objective").

**17.** *Hendel, supra* note 15, 705 A.2d at 664.

**18.** *Cf. Martin, supra,* 454 A.2d at 310 (where plaintiff was of advanced age and had a "sometimes confused mental state" and "generally weakened condition," and where hospital "knew that on prior occasions she had slipped loose from her restraints and attempted unsuccessfully to get out of bed," evidence that she was "left unattended for more than an hour, despite an instruction in the nursing protocol that restrained patients should be checked at least once every half-hour" readily supported inference of negligence).

**19.** *Cf. Miners Mem'l Hosp. Ass'n v. Miller,* 341 S.W.2d 244, 246 (Ky.1960) (observing, in case where it was "uncontroverted that [patient] had made two previous trips to the bathroom and was responsive to conversation," that "it is scarcely possible to resist the conclusion that patient was well able to summon a nurse had she chosen to do so," and holding that the "mere fact that the accident happened is no indication of negligence on the part of the hospital").

In other words, Mr. Mbozo's actual mental state is relevant to whether, if he had been able to look down upon his own situation as the objective reasonable man, he should have perceived "some evidence of wrongdoing."

In addition, the amended complaint alleges that the Hospital "failed to closely monitor Decedent's neurological status [after the fall] in order to ascertain if a neurological injury was in the initial stages of development and was likely to worsen." The record presents an issue of fact as to when Mr. Mbozo should have had notice of this alleged breach. This is especially so in light of appellant's deposition testimony that, when he spoke to his father's nurses on June 22 after he had learned of his father's fall, the nurses responded, "We are taking care of that. We know that" (reassurances that they may also have provided to Mr. Mbozo).

For all the reasons mentioned, the record as it now stands leaves open the possibility that Mr. Mbozo's cause of action may have accrued after June 22, 2002 (and as late as June 26, 2002, the date of his death). It thus provides no basis for concluding summarily that appellant's survival action accrued more than three years before he filed his original complaint on June 23, 2005. In light of the unresolved issues of material fact and deficiencies in the summary judgment record, the trial court should not have granted the Hospital's motion for summary judgment.[20] *See Miller, supra,* 463 F.3d at 276 (reversing a grant of summary judgment where the trial court failed to take into account "whether the decedent knew, or, more accurately, was even capable of knowing, that he was injured and the cause of his injury").

## IV.

■ By contrast, we uphold the grant of summary judgment in favor of the University and Dr. Johnson. As already described, these appellees were not named as defendants until the appellant filed an amended complaint on January 31, 2006, more than three years after Mr. Mbozo's death. The Hospital and the University assert, and appellant does not dispute, that they are two separate and distinct organizations. Thus, the addition of the University as a defendant in the January 31, 2006 amended complaint undisputedly "changed the party" against whom appellant asserted claims. Super. Ct. Civ. R(15)(c)(3). And, although appellant previously named and served a different "Dr. Karin John-

---

**20.** The Hospital urges us to affirm the grant of summary judgment in its favor on the ground that appellant never filed an opposition to its motion for summary judgment. *See* Super. Ct. Civ. R. 56(e) (providing that if an adverse party fails to oppose a motion for summary judgment, "summary judgment, *if appropriate,* shall be entered against the adverse party" (emphasis added)). However, as noted *supra,* even if a summary judgment motion is unopposed, the trial court (and we) must "review the pleadings and other papers and determine whether the moving party is legally entitled to judgment," rather than treat the motion as conceded. *Milton Props., supra,* 456 A.2d at 354. Here, appellant's opposition to the University's and Dr. Johnson's joint summary judgment motion set out arguments, and was supported by documents, that were pertinent to the Hospital's motion as well as to the University's and Dr. Johnson's motion. Moreover, appellant served this opposition on the Hospital. To affirm the grant of summary judgment solely on the ground the Hospital urges, particularly where the Hospital's own summary judgment papers did no more than incorporate by reference its co-defendants' arguments and statement of material facts not in dispute, would amount to resolving this case on a "mere technicalit[y]" and would be "entirely contrary to the spirit" of our rules of procedure. *Wallace v. Warehouse Employees Union No. 730,* 482 A.2d 801, 809 n. 23 (D.C.1984) (quoting *Foman v. Davis,* 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). We decline the invitation to do so.

son," a physician who practiced at the Hospital as an employee of Pulmonary Critical Care Associates, the record establishes that Dr. Karin Johnson is distinct from Dr. Karen Johnson. While appellant argues that his claims against the University and Dr. Karen Johnson "relate back" to the original complaint, pursuant to Rule 15(c)(3), we disagree.[21]

Rule 15(c)(3) provides in pertinent part that an amendment that "changes the party or the naming of the party against whom a claim is asserted" will "relate[ ] back to the date of the original pleading when (1) the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; (2) the party to be brought in by the amendment has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits; and (3) the party to be brought in by the amendment knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Super. Ct. Civ. R. 15(c)(3). In *Pritchett v. Stillwell*, 604 A.2d 886 (D.C.1992), we instructed courts to undertake a two-step inquiry when applying Rule 15(c). First, the court must determine if the amendment "change[d] the party." *Id.* at 888. If the amendment did not "change the party" but instead "merely correct[ed] a misnomer," then the claim automatically relates back. *Id.* If the amendment did "change the party," then

the claim will nonetheless relate back if the four conditions are present:

(1) the basic claim must have arisen out of the conduct set forth in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Arrington, supra,* 673 A.2d at 679–80 (italics and citation omitted).

■ There is no dispute that appellant's claim against the University and Dr. Johnson arose "out of the conduct ... set forth in the original pleading." Super. Ct. Civ. R. (15)(c). The issue is whether, although they were new parties, the University and Dr. Johnson each had "notice of the institution of the action," and whether each "knew or should have known that" it (she) was the intended defendant within the limitations period. *Arrington, supra,* 673 A.2d at 679. "A potential defendant who has not been named in a lawsuit by the time the statute of limitations has run is entitled to repose—unless it is or should be apparent to that person that he is the beneficiary of a mere slip of the pen, as it were." *Zuurbier v. MedStar Health, Inc.,* 895 A.2d 905, 910 (D.C.2006) (italics and citation omitted).

---

21. It appears from the January 31, 2006 complaint that appellant was attempting to sue the University only on a *respondeat superior* theory, charging it with vicarious liability for Dr. Johnson's acts rather than its own negligence. After describing the University as "an educational institution who provided, employed, or supervised medical residents assigned to the Defendant Hospital," the complaint alleges that the University "through its agents, servants, and employees," or through Dr. Johnson specifically, breached a duty of care owed to Mr. Mbozo; the complaint does not expressly allege any direct liability against the University in terms of failure to train or supervise. Nevertheless, we go on to analyze the relation-back issue with respect to the University as if the complaint alleged that the University was both directly and vicariously liable for injuries to Mr. Mbozo.

Here, nothing in the record casts doubt on the University's statement that it received no notice of the commencement of the action within the limitations period. Appellant has not disputed the University's assertion that it and the Hospital do not share an address or an agent for service of process and are not represented by the same counsel, cf. *Zuurbier, supra*, 895 A.2d at 908, and the record does not establish that the University otherwise had actual knowledge of appellant's suit within the limitations period. *Cf. Henderson v. Williams*, No. 05–1966, 2007 WL 778937, *3 (D.D.C.2007) (new defendants acknowledged receiving a copy of the complaint and speaking with plaintiff's attorney within the limitations period). Thus, to the extent that appellant sought to sue the University for direct liability for Mr. Mbozo's death, the claim is time-barred.

■ Appellant's claim against Dr. Johnson (and his vicarious liability claim against the University) suffers a similar fate. Appellant named Dr. Karin Johnson in his original complaint (and in successive amended complaints prior to January 31, 2006) and served Dr. Karin Johnson, but the record contains appellant's acknowledgment that the doctor "associated with Pulmonary Care"—i.e., Dr. Karin Johnson—was not the physician who delivered medical care to Manuel Mbozo. The record also contains Dr. Karen Johnson's affidavit stating that she was not aware of the lawsuit until March 1, 2006. Absent anything in the record that calls into question Dr. Karen Johnson's sworn statement, we must agree with the trial court that appellant's suit against her and his *respondeat superior* claim against the University are time-barred.[22] Accordingly, dismissal was proper, on statute of limitations grounds, as to Dr. Johnson and the University.

## V.

For the foregoing reasons, we affirm the judgment of the trial court with respect to appellees The George Washington University and Karen Johnson, M.D.; reverse the grant of summary judgment with respect to appellee District Hospital Partners t/a George Washington University Hospital; and remand for further proceedings consistent with this opinion.

*So ordered.*

---

22. *See Wood v. Barwood Cab Co.*, 648 A.2d 670, 671 (D.C.1994) (concluding that new defendant lacked notice for relation-back purposes where defendant "testified in his deposition that he had no knowledge of appellant's case [arising out of the defendant's conduct] until ... almost a year and a half after the statute expired, and appellant provided no proof to the contrary").