# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 9, 2020        Decided May 28, 2021

No. 20-7020

CHRISTOPHER CHANDLER,
APPELLANT

v.

DONALD BERLIN, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02136)

*Joseph R. Oliveri* argued the cause for appellant. With him on the briefs was *Thomas A. Clare*.

*John P. Dean* argued the cause for appellee. With him on the brief was *Steven M. Oster*.

Before: GARLAND[*], PILLARD and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

---

[*] Then-Judge Garland was a member of the panel at the time this case was submitted but did not participate in the final disposition of the case.

PILLARD, *Circuit Judge*:  Christopher Chandler, an international businessman, appeals from summary judgment holding his libel claims time-barred.  Chandler sued over what he contends are defamatory statements about him and his brother in a 2003 confidential report that were widely republished in the British media in 2017 and 2018.  Defendant Donald Berlin, a private investigator, prepared the report for a nonparty client who allegedly repeated its falsehoods in various public fora between 2009 and 2015 without identifying Berlin as a source of the information.  Then, in 2017, that client allegedly shared Berlin's report with a British reporter, leading to the repeated publication of the statements in British media.  After learning that Berlin was the original source of the statements, Chandler sued Berlin in 2018 for both his sale of the report to the client in 2003 and for that client's supplying the report to the media in 2017.  The district court granted summary judgment to Berlin.  It held that Chandler's claim on the 2003 publication was barred by the one-year statute of limitations for defamation and that Berlin could not be held liable for the client's republication in 2017 because the republication was not reasonably foreseeable.

We reverse in part.  The district court erred in holding Chandler's claim on the 2003 report time-barred on the summary judgment record, because the evidence does not establish as a matter of law that a reasonably diligent plaintiff would have sued Berlin more than a year before he did in 2018.  Berlin and his former client are not so closely connected that Chandler's knowledge of the client's pre-2017 defamatory statements itself caused accrual of Chandler's action against Berlin.  And reasonable jurors could differ as to whether facts available to Chandler before 2017 put him on inquiry notice of any claim against Berlin.  But we affirm the district court's holding that Berlin cannot be held liable for the nonparty client's republication of Berlin's statements in 2017.  Because

that type of belated republication was not reasonably foreseeable to Berlin in 2003, compensation for additional harms flowing from the republication would not be recoverable in any judgment that Berlin's 2003 report was libelous.

## BACKGROUND

Donald Berlin is a D.C.-based private investigator and the President and CEO of Investigative Consultants, Inc., a company that uses online databases and other research to conduct background investigations into individuals and organizations on behalf of its clients.[1] Robert Eringer is a writer of espionage-themed books and a self-described intelligence operative. In 2002, Eringer began working for Prince Albert II of Monaco, purportedly in an intelligence capacity. As part of his work for the Prince, Eringer hired Berlin to investigate Christopher Chandler and his brother Richard Chandler, two businessmen and investors originally from New Zealand who at the time were living and operating in part in Monaco. In early 2003, Berlin delivered to Eringer a 134-page report (2003 Report) with the results of his investigation.[2] Titled "Introduction and Overview, Richard Chandler Limited Global Scan," the 2003 Report included allegations of illicit activity by the Chandler brothers, including claims that they were engaged in money laundering on behalf of high-level Russian officials and Russian organized crime through a company said to be headquartered in Monaco. The report cited both public and proprietary databases as well as

---

[1] Berlin does business through two corporate entities: Investigative Consultants, Inc. and Investigative Consultants of Washington, DC, Inc. Both are defendants in this case. We refer to them collectively as Investigative Consultants, Inc.

[2] Only the first 34 pages of the 2003 Report are part of the record. Those pages include a header indicating that the complete document was 134 pages.

several unidentified people as the sources of its allegations. Each page of the report was marked "Confidential Memorandum to File."

In the years after he received Berlin's 2003 Report, Eringer made claims about the Chandlers in a variety of fora similar to the claims in that report. In 2004, Eringer prepared his own report on the Chandlers, asserting they supported Russian intelligence operations and repeating the money laundering allegations in the 2003 Report. Five years later, after his working relationship with Prince Albert apparently soured, Eringer sued the Prince in California state court for breach of contract and misrepresentation. In that 2009 Complaint, Eringer identified his investigation of the Chandlers among the intelligence work he claimed to have performed for the Prince. The complaint alleged it was "suspected [the Chandlers] were engaged in money laundering for Russian interests," noting that Eringer "possesse[d] documents on this matter" and claiming he had established that the Chandlers engaged in "unregistered, unlawful business in Monaco." J.A. 310-11. In 2014, Eringer self-published a book entitled *The Spymaster of Monte Carlo* (2014 Book) that included allegations like those in Eringer's 2009 California complaint. He posted an excerpt of that book online in an article called "The Art of the Ruse: Richard and Christopher Chandler" (2015 Online Article). Nowhere in the 2009 Complaint, the 2014 Book, or the 2015 Online Article did Eringer reference Berlin, Investigative Consultants, Inc., or their 2003 Report.

Christopher Chandler learned of Eringer's accusations about him and his brother soon after they first became public— by early 2010 at the latest. He discussed Eringer's California lawsuit in a January 2010 email to his brother, stating it was a "[p]ity to see this type of unfounded assertion/allegation in a

court filing" and "[n]ot good for our reputation, even though we know it to be false." J.A. 448. He added: "Makes me wonder if we should sue this guy (Robert Eringer) to force him to prove the comment or retract it." *Id.* And in a 2015 email, he described Eringer's "The Art of the Ruse" article as "old news [that] has been around for years." J.A. 450.[3] Chandler admits that by November 2015 he was also aware of Eringer's 2014 Book. J.A. 443.

Claims regarding Chandler's alleged connections to Russia became a source of public controversy for the first time in December 2017, when the British newspaper *The Sunday Times* published a story claiming that Chandler "was once placed under investigation in Monaco over his links to Russia." Tom Harper, "Brexit, dirty tricks and an international game of I Spy," *The Sunday Times* (Dec. 3, 2017), https://www.thetimes.co.uk/article/brexit-dirty-tricks-and-an-international-game-of-i-spy-3xq8cbxdj. At that time, Chandler was the object of political scrutiny in Britain because of his financial support for a think tank advocating the country's exit from the European Union. The *Times* story reported "that an 87-page dossier—which includes what appear to be copies of Monaco police files—is being circulated about Chandler and his brother Richard with allegations over links to Russia." *Id.* Several months later, in May 2018, a British Member of Parliament publicly stated that French intelligence services had suspected Chandler of working for Russian intelligence since 2003. Those statements led to widespread reporting by British media of the allegations against Chandler. The MP's

---

[3] The record also contains a 2012 email from Chandler, apparently referring to other material Eringer posted online (but omitted from this record), in which Chandler states that "we can carry on with our lives and leave the curiosity to others." J.A. 452 (email to Chandler referring to an "image from the Eringer Blog").

statements referenced documents he had seen that allegedly originated with Monaco security officials.

During an interview with the *Sunday Times* following the MP's statements, the *Times* showed Chandler the "87-page dossier" that the paper had referenced the prior December. Tom Harper & Oliver Shah, "Christopher Chandler: Russian spy? Money man for Putin and Trump? No—I'm just a shy billionaire," *The Sunday Times* (May 13, 2018), https://www.thetimes.co.uk/article/christopher-chandler-spy-money-man-for-putin-and-trump-no-im-just-a-shy-billionaire-2h58mbmqh. That document, which Chandler alleges Eringer shared with the *Times* in November 2017, included both the report that Eringer prepared on the Chandler brothers in 2004 and 34 pages of Berlin's original 2003 Report made at Eringer's behest. According to Chandler, this was the first time that he learned of the existence of the 2003 Report. After his interview, Chandler investigated its origins and learned that Berlin was its author.

In September 2018, Chandler sued Berlin and Investigative Consultants, Inc., in federal court for libel *per se*. The defendants moved to dismiss or, in the alternative, for summary judgment, arguing that they cannot be held liable for Eringer's alleged 2017 republication because they could not have reasonably foreseen it. They raised a one-year statute of limitations as a defense to any liability arising from initial publication of the 2003 Report they prepared for Eringer. Even if that limitations period were tolled by a discovery rule applicable to claims arising from injuries not immediately discoverable by plaintiffs, the defendants asserted that any tolling ceased once Chandler was put on notice of the libelous material. They alleged Chandler had such notice once Eringer included the libels in the 2009 Complaint, the 2014 Book, and

the 2015 Online Article, so the 2018 claims were time-barred because filed more than one year thereafter.

In April 2019, the district court granted summary judgment to the defendants with respect to the claim arising from the 2017 republication. Citing precedent that, under D.C. law, the maker of a defamatory statement can be held liable for his statement's republication "if such republication was reasonably foreseeable," *Tavoulareas v. Piro*, 759 F.2d 90, 136 n.56 (D.C. Cir. 1985), *vacated in part on other grounds, reh'g en banc granted*, 763 F.2d 1472, 1481 (D.C. Cir. 1985) (mem.), the court held that it was not reasonably foreseeable to Berlin in 2003, when he provided his report to Eringer, that Eringer would republish it more than a dozen years later.

The district court initially denied summary judgment on Chandler's claim against Berlin and his firm for publication of their 2003 Report to Eringer. Because that Report's 2003 publication was secret, the D.C. discovery rule applied to toll the limitations period for that claim. The court noted the absence of evidence bearing on Chandler's awareness of the 2009, 2014, or 2015 publications by Eringer that the defendants contend restarted the limitations period. The court thus authorized discovery on that point.[4]

Discovery unearthed emails showing that Chandler knew of Eringer's publications more than a year before he filed suit, so the district court granted summary judgment to the defendants with respect to the 2003 Report. *Chandler v. Berlin*, 436 F. Supp. 3d 322, 324 (D.D.C. 2020). The court

---

[4] Following that order, Chandler's counsel issued a subpoena *duces tecum* to Eringer, attempting to serve him at his last known address in California. But Eringer had sold that property, and Chandler's counsel declared before the district court that, even with the help of private investigators, they were unable to locate Eringer.

8

held that, even though Chandler did not learn of Berlin's 2003 Report until 2018, under D.C. law Chandler's earlier knowledge of Eringer's assertedly defamatory statements caused accrual of Chandler's claim against Berlin because Eringer and Berlin were "closely connected." *Id*. at 326-30 (quoting *Diamond v. Davis*, 680 A.2d 364, 381 (D.C. 1996)). The court alternatively held that Eringer's pre-2017 publications put Chandler on inquiry notice of his claim against Berlin because Eringer's writings used first-person plural pronouns in describing the investigation into the Chandlers, and because his 2009 Complaint referenced "documents" he had on the matter. The district court concluded that those "obvious clues ought to have alerted [Chandler] to the possibility that Eringer was not acting alone and that others could have supplied Eringer with the false information he was publishing." *Id.* at 330-31. The court also rejected Chandler's argument that the time bar did not apply insofar as Berlin's 2003 publication caused harm distinct from that caused by Eringer's republications years later. The court noted that the discovery rule does not permit a plaintiff to stand idly by "when an investigation would otherwise turn up evidence of a co-defendant's transgressions, even if a separate but related 'harm.'" *Id.* at 332.

**DISCUSSION**

On appeal, Chandler argues that the district court erred in both of its orders granting summary judgment to the defendants. We review an order granting summary judgment de novo. *Moose Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020). Summary judgment is appropriate if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

We conclude that the district court erred in holding as a matter of law that Chandler's claim against Berlin accrued when Chandler learned of Eringer's pre-2017 publications. But we affirm the judgment in the defendants' favor insofar as Chandler seeks damages for Eringer's alleged 2017 republication, because such republication was not reasonably foreseeable when Berlin shared his report with Eringer in 2003.

## A. The 2003 Publication

The District of Columbia has a one-year statute of limitations for libel claims, D.C. Code § 12-301(a)(4), and there is no dispute that D.C. law applies in this diversity tort case, *see Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 790 (D.C. Cir. 2019). Typically, "the statute of limitations runs from the date of publication." *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 (D.C. 2001). "Publication" is a term of art in defamation law, referring to one person's intentional or negligent communication of a defamatory statement about another to a third party. *See Hall v. District of Columbia*, 867 F.3d 138, 148-49 (D.C. Cir. 2017); Restatement (Second) of Torts § 577(1) (1977).

When "the relationship between the fact of injury and the alleged tortious conduct [is] obscure," D.C. courts apply the discovery rule to toll the statute of limitations "until plaintiffs know or reasonably should have known that they suffered injury due to the defendants' wrongdoing." *Mullin*, 785 A.2d at 298-99 (alteration in original) (quoting *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C. 1994) (en banc)). The D.C. Court of Appeals has declined to adopt the discovery rule "in the case of defamatory statements published in a mass media outlet," as "the fact of . . . injury [in such cases] can be

readily determined." *Id.* (quoting *Colbert*, 641 A.2d at 472). But it has "expressly left open the question of whether the discovery rule should be applied where the statement was undiscoverable because a defendant concealed the material, or because it was not otherwise discoverable." *Oparaugo v. Watts*, 884 A.2d 63, 74 n.8 (D.C. 2005); *see also Mullin*, 785 A.2d at 299 n.5 (raising possibility that the discovery rule "might be justified" in the case of defamatory statements that are "published secretly").

The parties here agree that the discovery rule applies to Chandler's claim against Berlin arising from the 2003 Report. The issue under the discovery rule is when that claim accrued. "Although what constitutes the accrual of a cause of action is a question of law, when accrual actually occurred in a particular case is a question of fact for the fact finder." *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 945 (D.C. 2003).

Under D.C. law, a claim accrues "when a plaintiff either has actual knowledge of a cause of action or is for some reason charged with knowledge of that cause of action." *Diamond*, 680 A.2d at 372. "The latter is known as inquiry notice," which is counterfactual in the sense that it refers to "that notice which a plaintiff would have possessed after due investigation." *Capitol Servs. Mgmt.*, 933 F.3d at 791. "The critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him." *Ray v. Queen*, 747 A.2d 1137, 1141-42 (D.C. 2000). Inquiry notice, in other words, is notice ascribed to a plaintiff whose unawareness results from the plaintiff's failure to exercise reasonable diligence appropriate to the particular circumstances.

11

Assessing whether inquiry notice exists requires a "highly factual analysis." *Diamond*, 680 A.2d at 372. In some cases, "the relevant facts may be such that it may be reasonable [for a plaintiff] to conduct no investigation at all." *Id.* In such a case, there is no inquiry notice so the limitations period does not start to run. "[A]lthough summary judgment on the issue of when accrual occurred may be granted in cases when there is no disputed issue of fact . . . , summary judgment is improper when there is a disputed question about plaintiff's diligence in investigating a possible cause of action." *Medlantic*, 814 A.2d at 946. If the evidence would permit the jury to find that the plaintiff neither knew more than a year before he filed suit that the defendant defamed him, nor reasonably should have then recognized a need to take steps that would have uncovered an unknown source of defamation, summary judgment must be denied.

An added complication to the discovery rule arises in cases where a plaintiff knows of harm but remains unaware of the very existence of one or more of the actors who may share culpability for it. Adopting the approach that we first applied to that issue in *Fitzgerald v. Seamans*, 553 F.2d 220 (D.C. Cir. 1977), the D.C. Court of Appeals held in *Diamond* that "the plaintiff's knowledge of wrongdoing on the part of one defendant [does] not cause accrual of his action against another, unknown defendant responsible for the same harm, unless the two defendants [are] closely connected, such as in a superior-subordinate relationship." 680 A.2d at 380.

The parties dispute whether Eringer and Berlin are "closely connected" such that Chandler's knowledge of defamation on the part of Eringer before 2017 caused his claim against Berlin to accrue then, more than a year before he sued. They do so by analogy to *Fitzgerald*, in which an employee of the Air Force alleged "a conspiracy to terminate his

government service in retaliation for his congressional testimony." 553 F.2d at 228. Because the appellant "had facts in hand sufficient to put him on notice of the conspiracy" within the Air Force more than three years before he filed suit, we affirmed summary judgment under the three-year limitations period in favor of all the Air Force officials appellant had sued. *Id.* at 228-29. That decision barred claims against even lower-level Air Force employees "not known to appellant three years before the complaint was filed," because even though he did not then know who they were, appellant had "constructive knowledge of grounds for the late lodged suit" and could have uncovered the specific identities of the subordinates who participated had he "proceeded with diligence within the 3-year period by suing those conspirators known to him at the time." *Id.* at 229. Where suit was not timely filed against the higher-ups, "it would be anomalous and unjust," we explained, "to allow appellant to begin an action against lesser fry merely because their identity and participation were earlier unknown." *Id.*

By contrast, we reversed summary judgment time-barring Fitzgerald's claims against a White House official whose role in the alleged conspiracy only later "emerged by happenstance during the Watergate hearings." *Id.* Unlike the "lesser fry in the Air Force," the White House official was "a person of influence in a different center of power." *Id.* Nothing in the record established "as a matter of law [that appellant] should have become aware prior [to the year of the hearings] of any White House involvement in his removal." *Id.*

Urging extension of *Fitzgerald* to the case at hand, Berlin argues that his relationship with Eringer is analogous to that between the higher- and lower-level Air Force officers. He claims that it is immaterial he was not an employee of Eringer, as his alleged actions as a contractor supplying Eringer with

false information were like those of the Air Force subordinates, who were unnamed informants in the improperly motivated investigation that led to Fitzgerald's removal. The district court agreed, noting that Berlin and Eringer worked in "lockstep to develop adverse information about" Chandler. 436 F. Supp. 3d at 329. Chandler, on the other hand, contends that Berlin is more like the White House official. He argues that Berlin and Eringer were not closely connected in the way that a superior and subordinate are, but were rather parties to a single, arm's-length transaction.

We need not decide which analogy better fits the facts at hand, because the *Fitzgerald* framework runs into a threshold obstacle to its application here: Under the facts at hand, Eringer and Berlin cannot be described as responsible for "the same harm" in the way the *Fitzgerald* framework contemplates. *Diamond*, 680 A.2d at 380. That framework suits a case where, for instance, defendants are alleged to be part of one conspiracy. *See, e.g.*, *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 701-02 (D.C. Cir. 2009); *Fitzgerald*, 553 F.2d at 228-29. But defamation law considers each publication of defamatory material as a distinct tort. *See* Restatement (Second) of Torts § 577A; *see also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007).

Berlin argues that treating his 2003 Report and Eringer's ensuing publications as different harms is inconsistent with Chandler's theory of the case, which claims that Berlin's 2003 Report was the basis of Eringer's defamation. But even if Eringer did rely in later publications on the 2003 Report, that does not merge the harms. This case is thus unlike *Fitzgerald* because the unknown defendant here is alleged to be responsible for at least one distinct publication.

We address below whether Chandler can hold Berlin liable for Eringer's alleged 2017 publication. The limited question at the threshold is whether, under *Fitzgerald*, Chandler's knowledge of Eringer's statements triggered accrual of Chandler's claim against a different defendant (Berlin) and about a different publication (the 2003 Report to Eringer). We hold that it did not.

The default rule is that a plaintiff's knowledge of wrongdoing against a known defendant does not cause accrual of her action against an unknown defendant. *Diamond*, 680 A.2d at 380. The exception urged here is for "closely connected" defendants. *Id.* In the paradigmatic example, such defendants are in a superior-subordinate relationship. *See, e.g.*, *Fitzgerald*, 553 F.2d at 229; *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 773 (D.C. 1998). Unlike defendants acting in concert through a close and ongoing relationship, Berlin prepared a report for Eringer in a single, arm's-length transaction. Berlin had no role in Eringer's subsequent publications; by 2009—the first year in which Eringer is alleged to have publicly repeated the allegations in the 2003 Report—Eringer's relationship with Berlin had long since ended. In light of those facts, Eringer and Berlin cannot be described as "closely connected" defendants "responsible for the same harm" under the *Fitzgerald* framework. *Diamond*, 680 A.2d at 380. Chandler's knowledge of Eringer's wrongdoing thus did not in and of itself cause accrual of his claim against Berlin. *Cf. Capitol Servs. Mgmt.*, 933 F.3d at 792 (despite company's knowledge of an injury and claims against the District of Columbia for the District's cancellation of a property management contract, company was not on notice of claim against its competitor for tortious interference because it did not know of competitor's involvement in the cancellation).

15

Even though Chandler's knowledge of Eringer's publications did not alone cause accrual, there remains a question as to whether there was anything in those publications to put Chandler on inquiry notice of claims against a wrongdoer other than Eringer. The district court concluded that Eringer's use of the first-person plural "we" and "our" when discussing his investigation into the Chandlers and his reference to "documents" on the Chandler matter in the 2009 Complaint "ought to have alerted [Chandler] to the possibility" of another actor whose identity Chandler would have discovered had he sued Eringer. *Chandler*, 436 F. Supp. 3d at 331. Berlin relies on the same language in arguing that Chandler should have known of the existence of an independent source, even if he did not know the source was Berlin.

That analysis falls short here in the summary judgment posture. Reasonable jurors could differ as to how to understand the references in Eringer's publications. *See Anderson*, 477 U.S. at 248. When the evidence is viewed in the light most favorable to Chandler, Eringer's earlier publications do not necessarily suggest the existence of an independent source for Eringer's allegedly false statements. Even if they implied the existence of some further source, a plaintiff in Chandler's shoes might reasonably have concluded that, to the extent the statements themselves were fabrications, the intimations of sources of the claims were also fabrications, or that accurate information was obtained elsewhere and distorted by Eringer. If so, reasonable diligence would not necessarily have required Chandler to sue Eringer in order to preserve any cause of action against an unidentified potential defamer in Berlin's role. *See Ouellette v. Beaupre*, 977 F.3d 127, 143-44 (1st Cir. 2020) (reversing summary judgment on record from which a "jury could easily conclude that even the most conscientious lay person would not reasonably think that a diligent investigation requires filing a lawsuit against one party to gain access to the

tools of discovery for the purpose of uncovering information regarding other possible parties").

The decision of the D.C. Court of Appeals in *Doe v. Medlantic Health Care Group* supports the point. The court there held that a plaintiff suing his hospital for improper disclosure of his HIV diagnosis was not, under the circumstances, on inquiry notice of that claim as soon as a coworker told him a hospital employee was the source of rumors at work about his condition. 814 A.2d at 948. When the plaintiff confronted the hospital employee—someone who had a second job working for the same employer as the plaintiff and his coworker—the hospital employee denied the accusation, and later both the hospital employee and the plaintiff's other coworker claimed the rumors were a joke. Because the plaintiff reasonably could have disbelieved the original accusation under those facts, "the jury could have found that [the plaintiff] was not required to investigate the hospital's involvement" at that time. *Id.*

The same is true here. Under the circumstances at hand, a jury might conclude it was reasonable for Chandler "to conduct no investigation at all" in response to hints in Eringer's publications of other wrongdoers. *Diamond*, 680 A.2d at 372. Chandler allowed the one-year statute of limitations to expire as to any claim against Eringer for conduct before 2017. But, in light of our holding that Berlin and Eringer did not have the type of relationship under *Fitzgerald* that would allow knowledge of a claim against one automatically to accrue a related claim against the other, Chandler's decision not to investigate Eringer does not necessarily establish a lack of diligence with respect to his claim against Berlin.

Berlin notes that the discovery rule does not allow a plaintiff to postpone deciding whether to sue to see if additional

harm occurs, but this is not such a case. Berlin relies on medical malpractice suits involving physical injury known to plaintiffs before the time bar, in which the claims are not rendered timely by worsening of the injury within the limitations period. *See, e.g.*, *Nelson v. Am. Nat'l Red Cross*, 26 F.3d 193, 197 (D.C. Cir. 1994). The question here, in contrast, is whether Chandler has a timely claim for the initial harm Berlin allegedly caused by his 2003 publication, not for any harm caused by subsequent publications.

Because there is "a disputed question about [the] plaintiff's diligence in investigating a possible cause of action," the district court erred in granting summary judgment. *Medlantic*, 814 A.2d at 946. The question on remand will be when Chandler first knew or should have known of a possible claim against Berlin. *See Diamond*, 680 A.2d at 372. That is, when Chandler first knew or should have known of "some injury, its cause-in-fact, and some evidence of wrongdoing" that was distinct from the known wrongdoing by Eringer. *Id.* at 381; *see also id.* at 379 (identifying those as the "three elements to the requisite knowledge"). Whether Chandler should have known of such a claim turns on whether reasonable diligence based on the facts before him at a certain point in time required that he then take steps that would have revealed Berlin's role. *See id.* at 372. Our holding implies no view as to the answer to that question; we conclude only that, based on the facts in this record, the existence or not of inquiry notice more than a year before Chandler filed suit must be addressed by the factfinder. *See Doe*, 814 A.2d at 945.

## B.  The 2017 Republication

Even though, on the summary judgment record, Chandler's cause of action on the 2003 Report is not time-barred, the district court correctly held that Berlin cannot be held

responsible for Eringer's alleged 2017 republication of the report. "The maker of a [defamatory] statement may be held accountable for its republication if such republication was reasonably foreseeable." *Tavoulareas*, 759 F.2d at 136 n.56; *accord Oparaugo*, 884 A.2d at 73; *Ingber v. Ross*, 479 A.2d 1256, 1269 (D.C. 1984); Restatement (Second) of Torts § 576. Based on the facts in the record, no reasonable jury could find that Eringer's republication to the British media was reasonably foreseeable to Berlin when he delivered his confidential report to Eringer fourteen years prior. As a result, Chandler cannot recover for any harm he may have suffered from the 2017 republication in the event Berlin is ultimately liable for the 2003 publication. Given our disposition, we need not consider how D.C. law would treat the relationship between a reasonably foreseeable 2017 republication and the original 2003 publication—in particular, whether under D.C. law a reasonably foreseeable republication gives rise to a separate claim against the original publisher or instead merely bears on the calculation of damages on the earlier publication. The answer to that question would matter if the 2017 republication were foreseeable and the 2003 claim ultimately held time-barred on remand. But because the republication in this case was not reasonably foreseeable, that issue is not presented here, regardless of the outcome on the timeliness question we addressed in the section above.

The only support Chandler identified for his claim that Berlin should have foreseen that the information he sold to Eringer would eventually be published elsewhere is information about Eringer's publishing history that was publicly available in 2003—several self-published espionage-themed books, a 2001 online article that described Eringer as a prolific author, and a 1984 decision by this court that identified him as a "freelance journalist," *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1567 (D.C. Cir. 1984), *vacated*, 477

U.S. 242 (1986). Chandler argues that it is "reasonable to infer" based on Berlin's investigative business and experience that he was "fully familiar with Eringer's public profile when [he] contracted" with Eringer in 2003. Appellant Br. 27. But Chandler produced nothing beyond general information from Berlin's website to support that inference, and he never sought to depose Berlin or conduct other discovery to pin down what Berlin actually knew in 2003 about Eringer and his plans regarding the report. For his part, Berlin declared under penalty of perjury that he did not authorize Eringer to disclose the report to any third party, let alone the British press in 2017.

The information Chandler points to is insufficient to permit a jury to find that it was reasonably foreseeable to Berlin in 2003 that Eringer would republish Berlin's statements through a major news outlet more than a dozen years down the road. This is not to suggest that the precise republication at issue and its date need to be foreseeable to establish republication liability. But republication under circumstances at least roughly similar to what in fact occurred must have been foreseeable.

That requirement is grounded in cases in which damages liability for republication has been established. The clearest examples are cases holding it foreseeable to a reporter's source that the reporter would publish what the source said. In *Tavoulareas*, for instance, we held that a jury could find a plaintiff responsible both for defamatory statements he made to a *Washington Post* reporter and for the paper's subsequent printing of those statements because the latter was a foreseeable consequence of the former. 759 F.2d at 136 n.56; *see also Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010) ("The obvious example [of republication foreseeability] is when a person makes a defamatory statement to a newspaper

reporter who, in turn, repeats it in a newspaper article[.]").[5]  In such a context, while the precise date and story in which a source's statements are published might not be foreseeable to the source, the general type of republication—publication within days, weeks, or months of the source's statements in newspapers or other media outlets—is reasonably foreseeable.

The principal republication case Chandler cites for a broader foreseeability standard—*Shepard v. Nabb*, 581 A.2d 839 (Md. Ct. Spec. App. 1990)—actually aligns with our understanding of republication foreseeability.  In *Shepard*, the court held that republication of a source's statements two months after the initial article in which the statements were used was a reasonably foreseeable "natural and probable consequence" of the initial statement.  *Id.* at 843, 845-46.  That holding is consistent with Chandler's contention, which we embrace, that republication on a specific future date need not have been reasonably foreseeable to support republication liability.  But *Shepard* does not suggest that the requisite foreseeability could be established based on *any* anticipation of *any* republication.  The holding is more contextual.  The plaintiff's allegation that a source's statements to a reporter "were made with the intent that they be published" in a particular newspaper on a specific date made it reasonable that a jury might find "that the republication of [the source's] remarks in later issues of that newspaper or another was a natural and probable consequence of the initial remarks to the reporter."  *Id.* at 846.

Similar logic undergirds *Green v. Cosby*, 138 F. Supp. 3d 114 (D. Mass. 2015), the only case Chandler cites in which a

---

[5] The panel opinion in *Tavoulareas* was vacated in part on other grounds upon grant of rehearing en banc.  763 F.2d at 1481.  The en banc court did not reach the issue of republication liability.  *See Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987) (en banc).

court held that a republication that occurred years after the original publication could have been reasonably foreseeable, supporting republication liability. In *Green*, celebrity comedian and actor Bill Cosby argued that the republication in 2014 of a statement his representative issued to a reporter in 2005 denying sexual assault accusations was not reasonably foreseeable. The court denied his motion to dismiss, holding that the plaintiffs' allegation that the representative made the denial "with the expectation and intent that [it] be republished if [the] allegations were reported again in the future" could support a holding of foreseeability even of a publication many years later. *Id.* at 127 (citation and internal quotation marks omitted). Such a holding demonstrates that, depending on the context of the publication, nature of the statements at issue, or other showing that defendant would have anticipated relatively remote future publication, passage of time alone will not necessarily render republication unforeseeable. Needless to say, *Green* does not bind us, and is materially distinct from this case.

Chandler attempts to fit his claim into the reporter-source category by emphasizing Eringer's background as an author and journalist. But even if Berlin knew of Eringer's writings, there is no record suggestion that Berlin shared information with Eringer for a news story. Instead, Berlin sold Eringer a preliminary intelligence report that was marked confidential on each page. Absent facts suggesting that Berlin in 2003 had reason to foresee that Eringer would distribute such a report to the media more than a decade later, he cannot be held liable for Eringer's alleged 2017 republication. Regardless, then, whether Berlin is ultimately found liable for his own 2003 publication, Chandler failed to make a record on which Berlin could be held responsible for damage flowing from Eringer's later republication.

22

\*    \*    \*

For the foregoing reasons, we reverse the district court's January 30, 2020, order granting summary judgment but affirm its April 3, 2019, order granting summary judgment and remand for further proceedings consistent with this opinion.

*So ordered.*